(No. 39709.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *vs.* RODNEY ROSOCHACKI, Appellant.

*Opinion filed January 29, 1969.*

WARD, J., took no part.

GERALD W. GETTY, Public Defender, of Chicago, (SHELVIN SINGER and JAMES J. DOHERTY, Assistant Public Defenders, of counsel,) for appellant.

WILLIAM G. CLARK, Attorney General, of Springfield, and JOHN J. STAMOS, State's Attorney, of Chicago, (FRED G. LEACH, Assistant Attorney General, and ELMER C. KISSANE and HOWARD LEVINE, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE UNDERWOOD delivered the opinion of the court:

Defendant Rodney Rosochacki was found guilty of murder by a jury in the Cook County circuit court and was sentenced to imprisonment for 30 to 50 years. He appeals, alleging error in that (1) the trial judge in a pretrial sanity hearing improperly directed a jury verdict of competency when there was evidence of incompetency before the jury; (2) his oral and written statements to police should not

have been admitted into evidence because they were taken after the defendant asked to talk to his priest but before he was able to talk to him; (3) the jury instructions differed from the charge against him; and (4) the prosecutor improperly used a co-defendant's statement against defendant, thereby denying defendant a fair trial.

On the night of November 30, 1964, at about 6:30 P.M., Sharon Haendiges and Donna Adrianowicz, two teen-age girls who had run away from home, met the defendant and co-defendant, Frank Nowak, at Pop's Restaurant, a local teen-age hangout on Ashland Avenue in Chicago. The four went to a movie and returned to Pop's at about midnight, staying there until the restaurant closed. At that time they left the restaurant and entered the hallway of a nearby apartment building to keep warm. Shortly thereafter the decedent, Zbigniew Kotaba, entered the hallway and invited the four to his apartment in the building. They accepted and went with Kotaba to his two-room apartment where the decedent produced a bottle of whiskey. All five sat around a kitchen table, talked and had several drinks. While they were drinking Sharon Haendiges asked the decedent if she could lie down because she was tired. He consented and she went to the bedroom where she lay down on one of two twin beds. Shortly thereafter decedent entered the bedroom and started touching Sharon and making advances toward her. She told him to leave her alone and returned to the kitchen table where she sat for about five minutes before returning to lie on one of the beds in the bedroom. This sequence of events was repeated several times. At one point while everyone was in the kitchen Kotaba stated that he would bet that he was going to marry Sharon, took money out of his pocket and laid it on the table. Later in the evening, as Sharon was lying on one of the twin beds, Kotaba again entered the room and this time Sharon persuaded him to lie down on the other bed to go to sleep. Shortly thereafter Frank Nowak entered the

bedroom and told Sharon that they were going to "roll" the decedent. A few minutes later Sharon saw the defendant enter the bedroom holding a bottle in his hand behind his back, and she testified that he succeeded in coaxing the decedent to get out of bed and come into the kitchen for coffee. As Kotaba walked toward the kitchen Sharon heard a crash and jumped out of bed. She saw the defendant and co-defendant fighting with the decedent in the kitchen whereupon she and Donna Andrianowicz ran out of the apartment and down the stairs. About midway down the stairs Donna said that she had forgotten her purse in the apartment, and Sharon returned to get it. When she re-entered the apartment Sharon saw Nowak and the defendant standing over the decedent who was lying on the floor. Shortly after the two girls left Kotaba's apartment building they saw defendant and the co-defendant running toward them, and all four went to another apartment where the defendant changed his pants and discarded his shirt. Sharon noted that Nowak and Rosochacki were "covered with blood" after fighting with the decedent. Later Nowak gave Sharon $45 and the four separated.

Frank Nowak was arrested in a barber shop by Chicago police officers Joseph Barrett and Patrick Angelo on December 1, 1964. Officer Barrett testified that when Nowak was apprehended he was asked why he had stabbed the decedent and Nowak responded, "I didn't stab him * * * Rodney stabbed him." Rosochacki's counsel objected to this reference to his client, asking that it be stricken. The court informed the jury that it would "be stricken as far as Rosochacki is concerned" but that it would stand so far as it related to Nowak. Later during the testimony of Officer Barrett, Rosochacki's attorney offered a continuing objection to any conversation outside the presence of his client. The court responded "The jury are instructed [that] any conversation now with Mr. Nowak and Officer Barrett and his partner is only against Nowak and it isn't to be

considered as against Rosochacki at this time." During his testimony Officer Barrett related three other instances in which co-defendant Nowak stated that Rodney Rosochacki had stabbed the decedent.

Rosochacki was arrested at his house by Officers Barrett and Angelo and he was taken with Nowak to the 4th Area Homicide office. When Rosochacki was confronted with Nowak and told that Nowak had accused him of doing the stabbing, the defendant asked to see a named priest. Officer Barrett testified that he told the defendant that he would contact the priest, and that, when the officer called the rectory he was told that the priest was not in but that he would come out as soon as he returned. After the officer related these facts to the defendant, Rosochacki indicated that he would be willing to make a statement. Officer Barrett said that the defendant orally admitted that he had struggled with the decedent when Kotaba came after Sharon and that his mind "went blank and the next thing he could recall was when he was out on the sidewalk with the knife in his hand with blood on it." During further conversation the defendant admitted that he had left the knife used in the stabbing in his father's house. This knife was recovered and introduced into evidence.

The signed confessions of the defendant and Nowak were also introduced into evidence and read to the jury. These statements were taken by a shorthand reporter in response to questions propounded by an assistant State's Attorney in the presence of Officer Angelo. In his signed statement Nowak related that he saw Rosochacki strike the decedent on the head with a bottle, and that when Kotaba tried to resist a beating being administered by Rosochacki, Nowak saw "Rodney pull his hand in back of his back and come out with the knife, and he [Rodney] started sticking him [Kotaba] then." Nowak's statement continued that after stabbing the decedent, Rosochacki began a search of Kotaba's pockets, and when Nowak observed money stick-

ing out of the decedent's pocket he grabbed it and ran. Nowak admitted he took fifty-five dollars from the decedent. When defense counsel objected to the reading of Nowak's statement so far as it related to the defendant the court admonished the jury as follows: "Ladies and gentlemen, this statement now is only in reference to Frank Nowak and no one else. The jury is instructed any place in there where anybody else is mentioned it isn't to be considered by the jury. Just his statement, only to Nowak." Reference to the Nowak statements in the State's jury argument is also contended to have prejudiced defendant when the assistant prosecutor said: "You are here on the killing, stabbing of the Polish soccer player. From there we find out Frank Nowak then tells the police officer he did not do the stabbing, that Rodney Rosochacki * * *" at which point defense counsel interrupted with a mistrial motion which was denied.

The gist of Rosochacki's signed statement was the same as the oral account that he had previously given Officer Barrett, *i.e.*, that he hit the decedent when Kotaba "made a grab" for Sharon and that he did not recall anything further until he was outside the apartment holding a knife which he owned, with blood covering his clothes. The defendant did admit, however, that, when the teenagers first met the decedent, Nowak suggested that they should wait until Kotaba passed out from drinking and then rob him.

We come now to the defendant's first point in this appeal. On April 21, 1965, a jury was impaneled to determine the defendant's competency to stand trial. A mistrial was declared however, when the defendant attempted to commit suicide by cutting his wrist so severely that hospitalization was required. A second competency hearing was held on May 13, 1965. At this later competency hearing two physicians specializing in mental diseases testified that they had each concluded that the defendant knew the

nature of the charge against him and that he was capable of co-operating with his counsel. One of the physicians, Dr. Haines, testified that he was of the opinion that the defendant was suffering from a mental disease which might affect his ability to co-operate with his attorney, but that such mental disease did not then prevent him from co-operating with counsel. Dr. Hoffman, the other physician who had examined the defendant, stated that Rosochacki was not then suffering from any mental disease. The third witness called by the defense was the defendant himself. The only response given by the defendant to questions propounded by the defense and prosecution was to state his name, and he remained silent when all other questions were asked. The State produced one witness, a Cook County deputy sheriff who was assigned to the criminal division. This witness testified that he had defendant in his custody an hour prior to his taking the witness stand, and that defendant had then talked to him about how he was getting along and had complained that his girl friend had failed to write him. The witness also stated that he had engaged in a general conversation with defendant about a week before. At the conclusion of all of the testimony the court directed the jury to find defendant competent to stand trial. The judge stated that he believed the defendant was a malingerer, and ruled that there was no contested issue present. We agree that there was no issue of fact to go to the jury, and we hold that the judge properly directed the jury verdict.

It is established law in this jurisdiction that a jury verdict in a competency hearing may be directed in appropriate circumstances. (*People* v. *Brown*, 31 Ill.2d 415, 420-1; *People* v. *Woods*, 26 Ill.2d 557, 560-1; see also *People* v. *Reeves*, 412 Ill. 555, 560.) A competency hearing is a preliminary civil proceeding in which the accused's competency is to be determined by a preponderance of the evidence. It is conducted separately and apart from the trial

on the criminal charge. (*People* v. *Bender*, 20 Ill.2d 45, 53; *People* v. *Cornelius*, 392 Ill. 599.) The test of competency at such a hearing is whether the defendant understands the nature of the charges against him and whether he can co-operate with his counsel to conduct his defense in a rational manner. (*People* v. *Bender*, 20 Ill.2d 45, 53; *People* v. *Burson*, 11 Ill.2d 360.) The criterion governing the direction of jury verdicts in civil cases is that they should be entered "only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (*Pedrick* v. *Peoria and Eastern Railroad Co.*, 37 Ill.2d 494, 510.) The only evidence in the defendant's competency hearing which had any tendency at all to prove his incompetency to stand trial was the testimony of Dr. Haines that the defendant was suffering from a mental disease which *might* affect his ability to co-operate with counsel. This testimony, however, was deprived of its probative value when the witness stated unequivocally that the mental disease with which he believed the defendant to be afflicted did not at that time prevent the defendant from co-operating with his attorney. We also believe that the defendant was aptly described as a "malingerer" by the trial court for refusing to answer questions propounded by counsel since the defendant had carried on a rational discussion with his custodian about an hour before taking the stand. Our *Pedrick* decision fully contemplates that trial courts are to decide when weak evidence has so faded in the strong light of all of the proof that only one verdict is possible of rendition. Under the present circumstances, especially in view of the uniform medical opinion as to the defendant's understanding of the charge against him and as to his ability to co-operate with defense counsel, we think that the trial judge properly directed the competency verdict.

Defendant relies on *Escobedo* v. *Illinois*, 378 U.S. 478,

12 L. Ed. 2d 977, 84 S. Ct. 1758, to support his second contention that his interrogation should have been suspended by police once he asked to see a certain priest. We find no implication in *Escobedo* that its protections relating to in-custody interrogation by police were intended to apply to a defendant who seeks the assistance of anyone other than a lawyer. Members of the clergy may be counsellors of the conscience but they are neither trained nor equipped to act as protectors of the legal rights of those accused of serious crimes. We know of no case in which the protections of *Escobedo* have been stretched as far as we are now urged by defendant to extend them. Accordingly, we hold defendant's oral and written confessions were taken in a constitutionally permissible manner and were properly introduced into evidence.

As his third point the defendant alleges that the jury instructions were improper because they incorrectly defined the charge against him. We think, however, that the instructions correctly informed the jury of the legal principles applicable to the facts in the case, and that there was no fatal variance between the crime charged and the instructions given. The indictment returned against the defendant alleged that he and Frank Nowak "committed the offense of murder, in that they, intentionally and knowingly stabbed and killed Zbigniew Kotaba with a knife, without lawful justification, in violation of Chapter 38, Section 9—1, of the Illinois Revised Statutes of 1963 * * *." Section 9—1 of the Criminal Code describes the crime of murder in the following manner:

"(a) A person who kills an individual without lawful justification commits murder, if, in performing the acts which cause the death:

(1) He either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) He knows that such acts create a strong probability

of death or great bodily harm to that individual or another; or

(3) He is attempting or committing a forcible felony other than voluntary manslaughter." (Ill. Rev. Stat. 1963, chap. 38, par. 9—1.)

The instructions given the jury included one instruction which describes the crime of murder in terms of subsection (a)(2) of section 9—1, and another which described murder in terms of subsection (a)(3). The defendant contends that since the indictment charged the defendant with murder as defined in subsection (a)(1), and the judge instructed the jury as to what constitutes murder under subsections (a)(2) and (a)(3), the jury was left with "no choice but to convict the defendant of an offense not charged by the indictment." In support of this contention the defendant cites cases which hold that an accused may not be charged with one crime and the jury instructed regarding a different crime. (*People* v. *Stanko,* 407 Ill. 624; *People* v. *Rongetti,* 331 Ill. 581; *People* v. *Crane,* 302 Ill. 217; *People* v. *Heisler,* 300 Ill. 98.) We find that the defendant here was charged with murder and convicted of that crime, and even if a variance did exist between the type of murder charged in the indictment and the types described in the instructions, it would not vitiate the conviction unless it was of such a character as to mislead the defendant in his defense or expose him to double jeopardy. (*People* v. *Nelson,* 33 Ill.2d 48, 52; *People* v. *Figgers,* 23 Ill.2d 516, 518-9.) There is no evidence in this case whatsoever that the defendant was misled in his defense, nor did counsel at any time during the proceedings request additional time, allege surprise, or claim that it was impossible for him to prepare a defense to the proof being offered against him. See *People* v. *Nelson,* 33 Ill.2d at 52.

The final contention of the defense is that the prosecution's use against defendant Rosochacki of co-defendant Nowak's statement denied defendant a fair trial. In *Bruton*

v. *United States,* 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, the United States Supreme Court recently held that admission in a joint trial of a co-defendant's extrajudicial confession which inculpates the other defendant violates that defendant's sixth amendment right to confront witnesses against him. In *Roberts* v. *Russell,* 392 U.S. 293, 20 L. Ed. 2d 1100, 88 S. Ct. 1921, *Bruton* was expressly held retroactive, and we are bound thereby unless the factual situation before us is so dissimilar to *Bruton* as to render that holding inapplicable here. We believe that it is. In *Bruton* the extrajudicial confession of the accomplice which inculpated defendant had been secured in violation of the *Miranda* standards, (384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602), and, on a retrial, that accomplice had been acquitted. The Supreme Court was therefore faced with the somewhat anomalous situation of a defendant who stood convicted largely as the result of an accomplice's confession which was not admissible against the accomplice who had, in fact, been found not guilty. The other evidence against the defendant was not persuasive as was noted by the Supreme Court in quoting from the Solicitor General's memorandum: "* * * the other evidence against [Bruton] is not strong". (391 U.S. 123, 20 L. Ed. 2d 476, 479, 88 S. Ct. 1622.) Bruton had made no inculpatory statements, and the Supreme Court noted: "Plainly, the introduction of Evans' confession added substantial, perhaps even critical, weight to the Government's case in a form not subject to cross-examination, since Evans did not take the stand." 391 U.S. 123, 20 L. Ed. 2d 476, 480, 88 S. Ct. 1623.

In contrast, the factual situation before us differs materially from *Bruton* and from *People* v. *Armstrong, ante,* p. 390, for in neither of those cases were confessions or admissions by the defendants admitted into evidence. Here Rosochacki's oral and written statements contained admissions substantially similar to the statements made by

Frank Nowak. The other evidence in this case, wholly apart from Nowak's inadmissible declarations, was convincing and plainly adequate to support the verdict. It is clear to us that a very substantial difference exists between a case in which a jury hears a co-defendant's statement incriminating a defendant who has himself made similar inculpatory admissions, and the *Bruton*-type case in which the co-defendant's statement is used against a defendant who has made no admissions. In the former case the prejudice to the defendant, if any, is minimal, and entirely insufficient to necessitate retrial, particularly where, as here, defendant's guilt seems clear. There can be no doubt that the jury placed far greater emphasis on Rosochacki's self-incriminating admissions than on the hearsay statements of his co-defendant.

We accordingly hold that the presence of defendant's own statements in this case so diminished the prejudicial effect of the admission of Nowak's inculpatory statements as to relegate the admission of such evidence to the status of harmless error. *Duggar* v. *United States* (10th cir.), 391 F.2d 433; *cert.* den. 37 L.W. 3133.

The judgment of the circuit court of Cook County is affirmed.

*Judgment affirmed.*

Mr. JUSTICE WARD took no part in the consideration or decision of this case.