THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CHARLES SANDERS *et al.*, Defendants-Appellants.

First District (2nd Division)    Nos. 80-1810, 80-1813 cons.

Opinion filed December 29, 1981.—Rehearing denied February 4, 1982.

Ralph Ruebner and Barbara Kamm, both of State Appellate Defender's Office, of Chicago, for appellant Charles Sanders.

James J. Doherty, Public Defender, of Chicago (Timothy K. McMorrow, Assistant Public Defender, of counsel), for appellant Benjamin Hunter.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Ruth Stern Geis, and David L. King, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

At the close of a joint trial, a jury found defendants Charles Sanders and Benjamin Hunter guilty of murder, armed robbery and home invasion of Killis Dickerson (victim), an 81-year-old resident of the Stateway Gardens Housing Project (Stateway Gardens). Sanders was sentenced to the penitentiary for concurrent terms of 30 years for murder, 25 years for armed robbery and 25 years for home invasion. Hunter was sentenced to serve concurrent terms of 24 years for murder, 20 years for armed robbery and 20 years for home invasion. Their separate appeals have been consolidated.

The issues raised by Hunter on appeal include whether: (1) defendant was denied his constitutional right to confront witnesses; (2) the prosecutor's comments in closing argument were proper; (3) evidence of a separate robbery perpetrated against the victim the day before the incident was properly admitted into evidence; (4) a psychologist was erroneously prohibited from testifying as to Hunter's inability to read and low intelligence; and (5) Hunter's inculpatory statement was the product of an unlawful arrest.

Sanders raises the issues of whether: (1) the trial court erred in denying his motion for severance under the circumstances of the case; and (2) the trial court's allowance of hearsay testimony denied Sanders his right to a fair trial.

Defendants were indicted separately; however, on the State's motion, the cases were consolidated for trial. The trial court denied subsequent motions made by both defendants for severance on the ground that each defendant made a statement inculpating themselves and the other in the crime, thereby constituting "interlocking" confessions. Hunter's pretrial motion to quash arrest and suppress evidence was also denied by the trial court.

At trial, the State presented the following case. Otis Harris, who lived in the apartment above the victim on April 14, 1979, testified that at 4:30 or 5 a.m. on that date, he was awakened by a call for help. The voice sounded like the victim's. He called the police. Chicago Police Officer Claude Insley testified that he and his partner responded to that call and were directed to the victim's apartment, where they found the door locked. They called the fire department for assistance. While waiting at the door, Insley heard a noise near the window, turned and saw a shadow near the balcony and heard a thud below, like somebody jumping down

from the window, coming from the victim's apartment. He could not recognize anyone. When Insley finally gained entrance to the apartment, he found the victim lying on the floor bleeding heavily.

The victim was transported to a hospital, where he died shortly thereafter. Dr. Eupil Choi testified that he performed an autopsy on the victim, from which he concluded that death was due to cerebral-cranial injuries inflicted by blunt trauma to the head.

Lonnie Austin, a security guard employed by Stateway Gardens, testified that after learning of the victim's death, he went to his apartment. He noticed that the bars of the window right next to the door had been pried open and that the window itself was open. The window was adjacent to the apartment door. One could open the window and reach around and unlock the door from the inside. On the day before the homicide, he spoke with the victim and observed that his face was swollen.

Chicago Police Investigator John Markham testified that after speaking with some residents in the victim's building two days after the incident, he went with his partner to Hunter's home and brought him to the police station. He had a conversation with Hunter there, during which Hunter stated that on the night before the homicide he met with another individual to discuss the robbery of the victim. On that same night they went to the victim's apartment, beat him and took $25. Hunter received $5 for his part in the robbery as a lookout man. In a second conversation, Hunter related that in the early morning hours of April 14, 1979, he discussed with Sanders the prospect of robbing Dickerson. Hunter was to act as a lookout. They entered Dickerson's apartment together. Hunter then left the apartment and went downstairs. When he saw a police car approaching, he went back upstairs to warn Sanders. Shortly thereafter, they left the apartment together. Hunter received $5 for his part in this robbery.

Elaine Geer, assistant state's attorney, testified that she went to the police station and met with Investigator Markham. She thereafter interviewed Hunter twice after apprising him of his constitutional rights, which he waived; once in the presence of a court reporter and once without. The recorded statement was essentially the same as the oral one. In his recorded statement, reduced to writing, and initialed by Hunter, who claimed that he could read and write, he stated that he was to act as the lookout man. They both entered victim's apartment through the balcony window. When the victim saw them he reached for a knife, but before he could do so, Sanders hit him in the face. After taking $5 from the victim, Sanders struck him in the head with a wood stick. Sanders beat the victim for 15 minutes, asking him where the money was. Hunter, standing at the kitchen door as lookout, observed these actions and, while

he told Sanders not to hurt the victim, he did nothing to stop him. Hunter then went downstairs, looking to see if any police were coming. When he saw a squad car approach, he returned to warn Sanders. They left the apartment, but, once outside, Sanders decided to go back because the "old man got some more money". Hunter went home and sat on his porch where he saw Sanders jump out of the front window of the victim's apartment. At the close of Geer's testimony, the trial court instructed the jury to consider Hunter's statement only against him.

Chicago Police Investigator Joseph Murphy testified that he questioned Sanders about the incident after he was brought in on April 18, 1979. Sanders claimed that he was with his cousin, Oscar Flowers, in Freeport, Illinois, at the time. When Flowers was contacted by another officer, he said he had not seen Sanders since January of 1979. When told of this contact, Sanders stated that he was at home with his mother on the day of the crime. When the police contacted Sanders' mother, she said she had not seen her son for a period of several days. Murphy told Sanders about the statement given by his mother and confronted him with Hunter's written confession. Sanders thereafter orally related that in the early morning hours of April 14, 1979, he met Hunter in the breezeway of Stateway Gardens. Hunter, armed with a lead pipe, said they should rob the victim. Sanders was to remain on the first floor in the breezeway to watch out for the police. Hunter left for the victim's apartment while Sanders remained at the breezeway. He became interested in a dice game going on in a nearby hallway. He saw two police officers running by, but since he did not have enough time to warn Hunter, he left the building. The next day he spoke with Hunter, who said he beat the victim and stole $10 but almost got caught. Hunter escaped by jumping out of a window when he heard the police at the door. Hunter offered Sanders $5 but he didn't take it because he felt that the police knew who committed the robbery and did not want to get involved any further. Sanders refused to put his statement in writing. The State then rested.

Sanders called his mother, Beatrice Sanders, to the stand. She testified that her son left with his sister-in-law on April 12 to go to Freeport, Illinois, and did not return until the 17th. Pamela Mitchell, another defense witness, testified that she lived across the yard from the victim's apartment. At about 4 a.m. on April 14, she saw a boy named "Tyrone" jump to the ground from the victim's balcony. The police were never given this information. She was a good friend of both defendants. Several other defense witnesses testified that Hunter was at a party from 10 p.m. on April 13 to 5 a.m. on April 14, 1979. Hunter's mother testified that her son had trouble in school and did not read very well.

Hunter attempted to call Dr. Paul Sabatini, a clinical psychologist, who was prepared to testify that, based upon his analyses of the tests

administered to him upon entering prison, Hunter was a borderline defective and was unable to read. The trial court disallowed his testimony.

Certain evidence, adduced during Hunter's motion to quash arrest and suppress evidence, will further an understanding of defendants' arguments on appeal. At the hearing, Hunter's mother, Estoyel Hunter, testified that at about 8 a.m. on April 16, 1979, two police officers came to her apartment and asked to see her son, who was asleep. Hunter testified that his mother woke him up to tell him that the police wanted to see him. He went to speak to them. They wanted to ask him some questions about the homicide at the police station. Although he was "willing" to go there, he was never told he did not have to go. The police handcuffed him both in the car and at the station. They also beat him with a night stick.

Also at the hearing, Investigator Markham testified that he and his partner went to Hunter's apartment in plainclothes without a warrant at about 10:30 or 11 a.m. on April 16. He asked Hunter if he would accompany them to the station for questioning with respect to the homicide. Hunter agreed to cooperate. Markham would not have compelled Hunter to come to the station if defendant had refused to cooperate. Hunter was not informed that he was free to remain at home. They did not search Hunter prior to transporting him to the station nor did they handcuff him at any time. At the station, Hunter was neither booked, nor placed in a lockup. No arrest information was taken from him. Hunter was taken into an interview room where he made an inculpatory statement.

## I

■■ Both defendants contend they were denied their rights under *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, because each made extrajudicial, inculpatory statements which were admitted at trial and which incriminated the other, yet neither testified. In particular, each defendant maintains that the denial of their motion for severance and the subsequent admission of the incriminatory statements into evidence, in view of the allegedly scanty evidence of guilt, was reversible error under *Bruton* and its progeny. *Bruton* held that the confrontation clause of the sixth amendment was violated by the admission at trial of an out-of-court statement of a co-defendant who did not testify, incriminating the other defendant, although the jury received a proper, limiting instruction. An exception to *Bruton* was announced later in *Parker v. Randolph* (1979), 442 U.S. 62, 75, 60 L. Ed. 2d 713, 99 S. Ct. 2132, however, when a four-member plurality of the court held that the admission of "interlocking confessions" with proper cautionary instructions, that the confession of one defendant cannot be considered as

evidence of the guilt of the other, did not offend *Bruton.* Their reasoning was that since a defendant's own confession is probably the most damaging evidence that can be admitted against him, the right of cross-examination is of far less importance to a defendant who has confessed than to one who has consistently maintained his innocence. (442 U.S. 62, 72-73, 60 L. Ed. 2d 713, 723, 99 S. Ct. 2132, 2139.) Even before *Parker,* the Illinois Supreme Court has held that there was no *Bruton* violation where the complaining defendant himself has made "similar inculpatory admissions." *People v. Bassett* (1974), 56 Ill. 2d 285, 295, 307 N.E.2d 359; *People v. Rosochacki* (1969), 41 Ill. 2d 483, 494, 244 N.E.2d 136. See also *People v. Turner* (1980), 92 Ill. App. 3d 265, 270-71, 415 N.E.2d 1114, decided after *Parker.*

In the present case, defendants' rights of confrontation were not infringed by the statements being received into evidence because of the similar inculpatory admissions therein. In their statements, both defendants admitted that in the early morning hours of April 14, 1979, they met in the breezeway of Stateway Gardens. They discussed the prospective robbery of the victim. An agreement to carry out this offense could be reasonably inferred from each statement. Each defendant took actions which promoted the crime. Each purportedly acted as a lookout while the other robbed and beat the victim. Although the confessions differ as to who initiated the plan and physically committed the robbing and beating, each confession, when considered only against its source, is by itself sufficient to support the convictions of each defendant. The rule governing interlocking confessions does not require that they be identical twins. (*United States ex rel. Stanbridge v. Zelker* (2d Cir. 1975), 514 F.2d 45, 48-49.) The question here of how the crime was specifically executed is of diminished significance in view of the Illinois accountability statute (Ill. Rev. Stat. 1977, ch. 38, par. 5—2(c)), under which each defendant could be properly found responsible for the other's deeds. Further, each inculpatory statement is highly damaging to and probative on the issue of guilt; any prejudice to either defendant from the admission of the other's statement is minimal where, as in this case, the jury was instructed to consider each statement only against its source. *People v. Randolph* (1979), 442 U.S. 62, 72-63, 60 L. Ed. 2d 713, 722-24, 99 S. Ct. 2132, 2138-39.

■■ Hunter further contends that without Sanders' statement the jury might easily have concluded that the fatal blows were struck when Sanders returned to the apartment for money while Hunter went home. This argument is without merit. According to Hunter's own statement, when Sanders beat the victim in the head with a stick for 15 minutes, Hunter watched from his vantage point at the kitchen door where he stationed himself in order to see if the police were coming. It was well within the province of the jury to conclude, without any consideration of

Sanders' statement, that when the fatal blows were struck, Hunter was aiding and abetting Sanders by acting as a lookout. (Ill. Rev. Stat. 1977, ch. 38, par. 5—2(c); *People v. Jones* (1980), 86 Ill. App. 3d 278, 282, 407 N.E.2d 1121; *People v. Krouse* (1975), 30 Ill. App. 3d 446, 333 N.E.2d 17.) We find no error.

## II

■■ Hunter asserts that the prosecutor, in closing argument, stated that defendant had confessed to Lonnie Austin, a statement which had no support in the evidence. In particular, defendant maintains that the following prosecutorial comment was improper:

> "He [Lonnie Austin] told you how these two guys told you they broke into Mr. Killis Dickerson's apartment. * * * [Defense counsel's objection is sustained] * * *. He told you how the break-in occurred. He described it."

Initially, we observe that since Hunter failed to raise this issue in his written motion for a new trial, he has waived any consideration of it. *People v. Precup* (1978), 73 Ill. 2d 7, 16, 382 N.E.2d 227; *People v. Pickett* (1973), 54 Ill. 2d 280, 282, 296 N.E.2d 856.

Assuming, *arguendo*, that defendant's contention had not been waived, it is nevertheless without substance. The prosecutor's remark did not claim that defendants confessed to Austin; rather, it referred to Austin's corroboration of Hunter's statement concerning defendants' method of gaining access to the victim's apartment. At trial, Austin stated that he went to the deceased's apartment and noticed that the bars on the window had been pried open. A person could "open the window and reach around and unlock the door from the inside." This corroborated Hunter's statement that defendants entered the victim's apartment through his window. The comment, correctly interpreted, was substantially supported by the record; any inaccurate inferences were cured by the prompt objection of counsel, sustained by the court. In addition, the jury was given an instruction (IPI Criminal No. 1.03), which told them that statements in closing argument not based upon the evidence should be disregarded. (*People v. Dominique* (1980), 86 Ill. App. 3d 794, 806-07, 408 N.E.2d 280.) No basis for reversal exists under these circumstances.

## III

Hunter assigns error in the admission of evidence indicating that defendant was involved in a crime collateral to the offenses charged. Specifically, he objects to Austin's testimony that the victim's face was swollen on April 13, 1979, and Hunter's oral and written statement that the night before the homicide he participated in a robbery of the victim.

Evidence of "other crimes" is admissible only if it shows knowledge,

intent, motive, design, plan or identification (*People v. Armstrong* (1969), 41 Ill. 2d 390, 398, 243 N.E.2d 825), and if its probative value outweighs its prejudicial impact. (*People v. Romero* (1977), 66 Ill. 2d 325, 330, 362 N.E.2d 288; *People v. Oliver* (1977), 50 Ill. App. 3d 665, 674, 365 N.E.2d 618.) There were strong similarities between the prior robbery and the offenses charged in the present case, including evidence of the robbing and beating of the same victim, in the same apartment, at night, with Hunter acting as a lookout, the day before the victim was robbed and fatally beaten. The disputed testimony is highly probative on the issue of intent, identity and *modus operandi* and tended to prove the guilt of Hunter. The probative value of such evidence clearly outweighs any prejudice therein and, accordingly, was properly received. *People v. Wilson* (1970), 46 Ill. 2d 376, 381, 263 N.E.2d 856; *People v. Tranowski* (1960), 20 Ill. 2d 11, 16, 169 N.E.2d 347.

■■ Furthermore, the jury was instructed that evidence of the commission of another crime should be considered by the jury only for the limited purpose of showing identification, presence, intent, motive, design and knowledge (IPI Criminal No. 3.14). Such an instruction substantially reduced any prejudicial impact which may have resulted by virtue of the admittance of such evidence. (*People v. Kirkwood* (1980), 82 Ill. App. 3d 252, 260, 402 N.E.2d 677.) We find no abuse of discretion by the trial court in admitting this evidence.

## IV

The trial court is next charged with having erroneously refused to allow a defense psychologist to testify as Hunter's low intelligence and inability to read. Hunter maintains that had this evidence been allowed, it would have supported his claim that he did not voluntarily sign his written confession and would have raised serious questions as to his ability to make a knowing waiver of his rights. Outside the presence of the jury, and for purposes of defendant's offer of proof, Dr. Paul Sabatini testified that he was a clinical psychologist in charge of the dignostic center at the Cook County House of Corrections. Upon entering the House of Corrections, as in the case of each new inmate, Hunter was given a battery of tests, including an intelligence and personality test administered on a group basis by someone under Sabatini's general supervision. There was, however, no way of ascertaining which member of his staff administered the particular test taken by Hunter. The test results indicated that Hunter had an I.Q. of 69 or 70 and was "no reader whatsoever."

Relying upon *People v. Ward* (1975), 61 Ill. 2d 559, 338 N.E.2d 171, Hunter argues that Dr. Sabatini was improperly barred from testifying as an expert with respect to his low intelligence and inability to read. *Ward* held that a physician may express his opinion as to a defendant's sanity

based in part upon medical reports compiled with others which have not been admitted into evidence, provided that such reports are commonly utilized by the medical profession. The court in *Ward* bottomed its holding on the premise that materials customarily employed by the medical profession attribute a high degree of reliability to them. 61 Ill. 2d 559, 567-68; see Fed. R. Evid. 703, 28 U.S.C.A. 503 (1975).

■■ Hunter's reliance on *Ward* is patently misplaced. On examination by the court during defendant's offer of proof, Dr. Sabatini stated he would have to "go into further tests" in order to evaluate whether defendant really was a nonreader and that someone taking the test given defendant "could just look at that paper, not perform the test and yet be a reader." The record fails to establish that the tests given defendant were commonly used by the medical profession in ascertaining one's intelligence or ability to read or sufficiently reliable to warrant the receipt of Dr. Sabatini's opinion. Further, unlike the expert testimony in *Ward*, Dr. Sabatini's opinion was based exclusively, rather than in part, on materials not in the record. (*People v. Cooper* (1978), 64 Ill. App. 3d 880, 886, 381 N.E.2d 1178; see also *Wilson v. Clark* (1981), 84 Ill. 2d 186, 193, 196, 417 N.E.2d 1322.) We find no error in the trial court's ruling in this regard.

## V

■■■ Hunter maintains that he was illegally under arrest when he made his inculpatory statements at the police station and, therefore, the statements should have been suppressed. An arrest occurs when the police inform a suspect of a violation, he submits to their control, and it is clearly shown that the officers intended to effectuate the arrest and the defendant understood them. (*People v. Wipfler* (1977), 68 Ill. 2d 158, 165, 368 N.E.2d 870.) The absence of a threatening presence of several officers, display of a weapon, a physical touching, use of language or tone of voice which indicates that compliance with the officer's request might be compelled, permits, as a matter of law, the conclusion that no seizure of the person has taken place. (*United States v. Mendenhall* (1980), 446 U.S. 544, 64 L. Ed. 497, 100 S. Ct. 1870.) The intent of the officer and the understanding of the arrestee are two essential elements in the definition of an arrest (68 Ill. 2d 158, 165), the former of which is absent in the instant case. Investigator Markham testified that he and his partner, dressed in plainclothes, went to defendant's apartment and asked Hunter if he would accompany them to the station for questioning with respect to the homicide. He agreed. Hunter would not have been forced to come to the station had he sought to stay at home. He was allowed to get fully dressed. Prior to making his inculpatory statement, he was not searched, handcuffed, booked, fingerprinted, photographed, nor placed in a lockup. No arrest information was taken from him. In view of the foregoing, the trial

court's ruling that defendant was not under arrest when he was given *Miranda* warnings and made his inculpatory statement was supported by the record. (*People v. Wipfler*; *United States v. Mendenhall.*) The fact that *Miranda* warnings were given is merely indicative of proper cautiousness on the part of the police officer, rather than of the officer's intent to arrest. *People v. Wipfler*; *People v. Gale* (1979), 72 Ill. App. 3d 23, 25, 390 N.E.2d 921.

Relying upon *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248, Hunter contends that he was under "arrest for purposes of this Fourth Amendment right against unlawful searches and seizures." In *Dunaway*, the Supreme Court held that the police violated the fourth amendment when, without either probable cause or a warrant, they "seized petitioner and transported him to the police station." (442 U.S. 200, 216.) *Dunaway*, however, is inapposite, because in that case the detectives were ordered to bring petitioner in and petitioner would have been physically restrained had he attempted to leave, whereas in the instant case the investigators were under no such orders and would not have forced defendant to come to the station had defendant resisted. *People v. Dowdell* (1980), 81 Ill. App. 3d 266, 401 N.E.2d 295, *People v. McMahon* (1980), 83 Ill. App. 3d 137, 403 N.E.2d 781, and *People v. Townes* (1981), 94 Ill. App. 3d 850, 419 N.E.2d 604, cited by Hunter, are of little aid to his position. The first two authorities were decided prior to *United States v. Mendenhall*; the last, unlike the present case, involved five separate interrogations lasting over 12 hours before a confession was made.

## VI

Defendant Sanders contends that the trial court erroneously allowed Investigator Murphy to testify about another officer's telephone call to Oscar Flowers, defendant's cousin and to Beatrice Sanders, defendant's mother, the contents of which contradicted Sanders' defense. On direct examination, Murphy testified that Sanders said he was with his cousin in Freeport, Illinois, at the time of the incident. Against defendant's objection, Murphy was allowed to testify that he told Sanders that his cousin had informed the investigators that he had not seen him since January of 1979. Sanders then said he was with his mother at the time of the occurrence. Murphy told Sanders that the investigators had contacted his mother and that his mother related that "if he had told us he was home that night he was lying to us." Murphy was not the investigator who "contacted" defendant's cousin or mother.

■■ Defendant, however, by failing to raise this issue in his written notice for a new trial has waived his right to urge it as a ground for reversal. (*People v. Precup* (1978), 73 Ill. 2d 7, 16, 382 N.E.2d 227; *People v. Pickett*

(1973), 54 Ill. 2d 280, 296 N.E.2d 856.) Close examination of the transcript and briefs reveals that the defect complained of fails to rise to the level of plain error. Ill. Rev. Stat. 1979, ch. 110A, par. 615(a); *People v. Carlson* (1980), 79 Ill. 2d 564, 576-78, 404 N.E.2d 233.

For the reasons set forth above, we find no bases upon which to disturb the jury verdicts or judgments entered in the present cases, and we are therefore compelled to affirm in each instance.

Affirmed.

STAMOS and PERLIN, JJ., concur.