THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LEROY SANFORD *et al.*, Defendants-Appellants.

First District (5th Division)   Nos. 80—1125, 80—1602 cons.

Opinion filed July 29, 1983.

James J. Doherty, Public Defender, of Chicago (Robert M. Guch, Assistant Public Defender, of counsel), for appellant Leroy Sanford.

Richard E. Gorman, of Chicago, for appellant Edward James.

Ralph Ruebner and Gordon Berry, both of State Appellate Defender's Office, of Chicago, for appellant James Lewis.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Marie Quinlivan, and Jane E. Liechty, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MEJDA delivered the opinion of the court:

Following a joint jury trial, defendants Leroy Sanford, Edward James and James Lewis were found guilty of armed robbery stemming from a hold up of a service station. Each defendant was sentenced to an extended term of 60 years' imprisonment. Their appeals have been consolidated.

The issues raised on appeal are: (1) whether the trial court erred in denying James' motion for severance; (2) whether the trial court erred in admitting codefendants' incriminating statements at their joint trial; (3) whether the trial court erred in denying James' motion to suppress police identification testimony; (4) whether an accumulation of errors denied James and Lewis their right to a fair trial; (5) whether James' inculpatory statement should have been suppressed as stemming from improper extradition; and (6) whether Lewis and Sanford were improperly sentenced to extended-term sentences.

The defendants, along with Lawrence Poree, were indicted jointly. James and Lewis were taken into custody from authorities in Memphis, Tennessee, by Chicago police officers. Before trial, James and Lewis moved for severance on the ground that each of the four defendants had made statements to police which inculpated themselves and the others. The motion was denied and the statements were ultimately admitted into evidence. The trial court granted Lewis' motion *in limine* to bar an alleged statement by him regarding an unrelated crime and denied James' and Lewis' pretrial motions to suppress identification testimony and other evidence at their subsequent trial.

The State presented the following pertinent evidence at trial. Dwayne Humbert was employed pumping gas at the Concord Gas Station in Chicago at 4:15 a.m. on August 7, 1979, when a white Mercedes Benz containing four black men entered the gas lane in the wrong direction. While he filled their order for gas, two of the men walked to the station, a third walked to the front of the car, and the fourth got out of the car. The latter wore a black stocking mask on his face and held a gun which looked like a machine gun. Humbert was then ordered to go to the porch of the station where he saw coworker Joe Varner lying face down on the ground. One of the men took the witness' money, $100, and made him lie down next to Varner. After the robbers drove away, he found Hoover Thompkins in the back of the station. He did not observe any faces of the robbers.

Hoover Thompkins, manager of the gas station, testified. Upon seeing the Mercedes parked in the wrong direction, he approached the car and told the four occupants to turn the car around. He identified

Poree as one of the men in the car. He could not recognize anyone else. Poree carried what looked to him like a submachine gun. Then a person whom he identified as Sanford placed a .45-caliber gun in his face and ordered him to get the keys and open the safe. When the witness replied that the keys weren't there, Sanford turned him around and hit him on the back of the head, telling him to find the keys or he would be killed. After the witness opened the safe, Sanford took between $4,700 and $5,700 and ordered Thompkins to lie on the floor. Thompkins later received seven stitches as treatment for his head injury. He later viewed a police lineup and identified Poree and Sanford.

Charles Hardison, a gas station employee, testified that he and Eddie Jones, the station security guard, saw a man wielding a .45-caliber gun enter the station. This man had some grey hair and a slight beard. In court he indicated that James was this man. He also saw a tall masked man at the door carrying a machine gun. This man ordered him to lie on the floor and not to look at him or he'd be shot. Then the masked man took from him a money belt and coin changer and an additional $120, $60 in cash and a $60 check payable to Percy Powell.

Eddie Jones, the security guard, testified that at about 4:15 a.m. he saw a man carrying a .45-caliber automatic handgun walk up and say "This is a hold up." This man was light-skinned and had a grey streak in his hair and beard. He identified this man in court as James. He was ordered to "hit the floor" while his gun and wallet were removed. He then heard Thompkins get the safe keys and open the safe. As security guard he had deposited 57 envelopes of cash, or $5,700, into the safe that night. Later he identified a photo of James as depicting the gunman. He also identified James in a lineup and again identified him in court.

Stanley Dillard, an employee of the service station, testified that after he sold a black man a pack of cigarettes this man displayed a .38-caliber handgun. At gunpoint, the man took the witness' money, about $40 or $50, and walked him to the area where the others were lying on the ground. He was unable to identify anyone in a later police lineup and none of the four defendants present in court had held him up. He identified a photograph of Maurice Powell as the man who robbed him.

Chicago police officer Kevin Hanlon testified that at 4:45 a.m. he responded to a radio dispatch of an officer needing help. After arriving at a T-shaped alley near South Morgan and Sangamon streets, he joined 20 police officers in a search of the area. While searching, he

found a .44-caliber revolver on the street. An evidence technician dusted the weapon for latent fingerprints.

Sergeant William Ross, a police beat supervisor, testified that on the date of the robbery he was patrolling alone in a marked squad car near 87th Street and Vincennes Avenue when he observed a Cadillac run a red light. He noticed there were several occupants in the car but he only observed the face of the driver. He then chased the vehicle into the T-alley at Morgan and Sangamon. There, he pulled alongside the car. Its doors were open, the engine running and its occupants were just in front, running away. Two of them turned and he saw their faces from a distance of about 25 feet. It was dark but the alley was lighted up and down. He gave chase on foot and as he got out of his car, he heard two shots. He called for help on his portable radio. Upon searching the Cadillac, he found a gun belt, an empty holster, a coin changer, shotgun shells and a styrofoam case for a Thompson-type submachine gun. At a police lineup he identified Lewis and James as the two men he observed in the alley. Prior to this lineup he had seen a police bulletin containing photographs of these defendants. At trial, he again identified Lewis and James. On cross-examination he did not recall giving a statement to an investigator "that as [I] entered the alley several shots were fired at [me] and [I] then accelerated [my] squad car to escape injuries and block with [my] vehicle the southern escape and wait for additional units to arrive."

Officers John O'Brien, Thomas White and Gerald Corless testified. They participated in an organized search of the alley. O'Brien found a shotgun, and then observed a man lying near a bush. The man was placed under arrest. O'Brien then saw an automatic pistol and what appeared to be a machine gun magazine loaded with .45-caliber bullets. He then found the purported machine gun which turned out to be a semi-automatic carbine. Investigator Corless saw Poree in the bushes in the alley and found a 12-gauge shotgun nearby. A live red shell inside its chamber matched those found in the Cadillac. Corless searched Poree and found U.S. currency and the check made out to Percy Powell. Later, he located the white Mercedes. Inside it was a .9-millimeter spent casing. The certificate of title of the Cadillac was in the name of Maurice Powell. Officer White found two masks, one in the grass and the other on Sanford, who was lying in some shrubbery along a house nearby. He also found a loaded .9-millimeter pistol and a large .45-caliber magazine in the front yard of the house. In his hand Sanford was holding a roll of single dollar bills, totaling $60.

James Linn, assistant State's Attorney, testified that he interviewed Sanford and Poree on August 7, 1979. Their conversations

were recorded only by Linn's brief written notes. Sanford's statement to Linn recounted that he, James, Lewis, Poree and Maurice Powell all met at Poree's house to plan a robbery of the gas station. They had decided that if they were all armed, they could overpower anyone there and easily get the money. They proceeded to the scene, all armed, except Sanford; Poree had the carbine, Powell and Lewis had handguns, and James had a shotgun. After they first checked out the gas station, they entered with their guns drawn. Poree aimed the so-called machine gun at the manager and threatened to blow his head off if he did not open the safe. Sanford took the money from the safe. After the group fled in the car somebody started shooting. They finally came to an alley and everybody ran in different directions. Poree's statement was essentially the same. Poree carried the carbine which he hoped would appear to be a machine gun and he wore a nylon stocking mask. After the robbery Maurice Powell started shooting at someone, ultimately attracting the police. After Linn's testimony, the trial court instructed the jury to consider Poree's statement only against him and Sanford's statement only against him and not against any of the other defendants.

Chicago police sergeant John Burge testified that he and Investigator Wagner interviewed Poree and Sanford on August 7, 1979. Poree furnished the officers with the names of the four other people allegedly involved—Sanford, Lewis, James and Maurice Powell. He then described the robbery. Sanford mentioned the use of the stolen Mercedes Benz which was used in conjunction with Maurice Powell's Cadillac and he gave information on the location of the other participants. After telephone conversations with Tennessee authorities, extradition proceedings were commenced with respect to James and Lewis. On November 13, 1979, Burge, Wagner and Investigator Basile went to Memphis and took custody of James and Lewis at the Shelby County Jail and transported them to Chicago.

Dennis O'Neil of the latent fingerprint unit of the Chicago police department testified that a latent print lifted from the Mercedes Benz showed in excess of 40 points of comparison similar to those of the left ring finger of Lewis. Usually, 12 to 10 similar points constitute positive identification. In his opinion, the print belonged to Lewis.

Investigator Frank Laverty testified that on November 13, 1979, he interviewed James who admitted participation in the robbery with Powell, Poree and Lewis. On the same date, Assistant State's Attorney Lawrence Terrell interviewed Lewis. Terrell testified that Lewis stated that the police had no case against him; that the police chasing the car never saw him because he was running with his back to them

and was too far down the alley. Lewis stated that the others in the car were shooting at the officer running down the alley. When Terrell confronted Lewis with the fact that he'd been identified in a lineup and implicated by codefendants, he said, "Yes, I did it, but there is no identification." Terrell also interviewed James who admitted his participation in the robbery and stated that he had fled with Powell to Memphis. At the close of Laverty's and Terrell's testimony, the trial court instructed the jury to consider James' statements only against him and Lewis' statements only against him, and not against any other defendants.

Finally, James testified on his own behalf. He denied participating in the robbery and he further denied making an inculpatory statement to Assistant State's Attorney Terrell. He also stated that he was struck several times by police during his interrogation and that he was confronted about a murder and not about his involvement in an armed robbery. The State introduced a prior conviction for impeachment purposes.

OPINION

The first issue raised is whether the trial court erred in denying James' motion for severance. James and Lewis also contend that under the circumstances, where all codefendants made extrajudicial, inculpatory statements which subsequently were admitted at their joint trial they were denied their sixth amendment rights to confrontation under *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, and its progeny.

■ We find no error in the trial court's denial of James' severance motion, and no *Bruton* violation by the admission of codefendants' out-of-court statements. Defendants jointly indicted are to be jointly tried unless fairness to one of the defendants requires a special trial to avoid prejudice. (*People v. Lee* (1981), 87 Ill. 2d 182, 429 N.E.2d 461.) To show prejudice, however, a defendant must actively and specifically point out an antagonism in the defenses and thereby demonstrate the prejudice arising from the joint trial. (*Lee.*) The decision to grant a separate trial is within the sound discretion of the trial court, and will not be reversed absent an abuse of discretion. (*Lee; People v. Davis* (1976), 43 Ill. App. 3d 603, 357 N.E.2d 96.) In his brief, James fails to mention how he was prejudiced by a joint trial but for his vague reference to "the compromising situation in respect to the evidence that [he] found himself in." This nonspecific allegation plainly fails to demonstrate the antagonism of defenses resulting in prejudice with requisite specificity to warrant severance or reversal.

Moreover, no mention of this issue was raised in James' post-trial motion for a new trial and, therefore, the issue is deemed waived for review. *People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856; *People v. Murphy* (1981), 93 Ill. App. 3d 606, 417 N.E.2d 759.

With respect to James' and Lewis' claim of error under *Bruton*, we refer to the exception to the *Bruton* rule announced in *Parker v. Randolph* (1979), 442 U.S. 62, 60 L. Ed. 2d 713, 99 S. Ct. 2132. There, a four-member plurality of the Supreme Court held that the admission of "interlocking confessions" with the proper cautionary instructions that the confession of one defendant cannot be considered as evidence of the guilt of the other, does not violate a defendant's rights under the fourteenth or sixth amendments. (442 U.S. 62, 75, 60 L. Ed. 2d 713, 724-25, 99 S. Ct. 2132, 2140.) Similarly, our supreme court had held that no *Bruton* violation occurs where the complaining defendant himself has made similar inculpatory admissions. *People v. Bassett* (1974), 56 Ill. 2d 285, 307 N.E.2d 359; *People v. Rosochacki* (1969), 41 Ill. 2d 483, 244 N.E.2d 136; see also *People v. Sanders* (1981), 103 Ill. App. 3d 700, 431 N.E.2d 1145.

■ Here, each defendant admitted his own participation in the armed robbery and their statements, although not identical, agreed on such crucial facts as time, location, felonious activity, and awareness of the overall plan or scheme and were, therefore, "interlocking confessions." (*Parker*.) The trial court properly instructed the jury that the confessions of one defendant could not be considered as evidence of guilt of the others. Thus, the admission of the inculpatory statements conformed to the requirements of the sixth amendment (*Parker; Sanders*), and we find no error. Finally, we note that there was ample independent evidence of James' and Lewis' guilt to further support the State's contention that any error was harmless beyond a reasonable doubt under *Bruton*. Three witnesses identified James as a perpetrator of the crime and two witnesses identified Lewis. Also, Lewis' fingerprints were found on the door of the getaway car. This evidence taken with James' and Lewis' own confessions served to minimize any prejudice to either from the admission of the other's statements.

■ James and Lewis next contend that the trial court erred in denying a motion to suppress the lineup identification testimony of Sergeant Ross. They argue that Ross' identification of Lewis and James was impermissibly suggestive because (1) Ross was told before the lineup that "two additional suspects" would be in the lineup, and (2) because some time before the lineup Ross viewed a bulletin showing a photograph of Lewis depicting him as one "wanted" for armed

robbery. Under the circumstances of this case, however, we do not find that the trial court erred in refusing to suppress Ross' lineup identification. Initially, defendants have not contended that the identification procedures were suggestive in the context that a likelihood of misidentification resulted, as is normally required for reversal. (See *People v. Carlton* (1979), 78 Ill. App. 3d 1098, 398 N.E.2d 107.) Also, the mere suggestion that the perpetrator of the crime is in the lineup, from a practical standpoint, has been held to be not unduly suggestive. (*E.g., People v. Sanders* (1977), 54 Ill. App. 3d 500, 369 N.E.2d 912.) Moreover, Ross' suppression hearing testimony established that he made his identification on the basis of his observation of Lewis' face as the defendant fled from the getaway car under lighted conditions and from a distance of 25 feet, rather than on the basis of Lewis' photograph. Thus, the trial court had sufficient basis to find that neither the remarks nor the police bulletin influenced the outcome of the lineup.

Next, James and Lewis contend that an accumulation of errors denied them a right to a fair trial. Specifically, they first contend that the in-court identification procedures were "clumsy" because the eyewitnesses were permitted to leave the stand to identify the defendants while "surrounded" by assistant State's Attorneys and deputy sheriffs, thereby creating the inference that the defendants were dangerous. However, in their briefs neither defendant has supported this contention with argument or citation to authorities as required by Supreme Court Rule 341(e)(7) (73 Ill. 2d R. 341(e)(7)), and this contention, therefore, is deemed waived. See *Terracina v. Castelli* (1979), 80 Ill. App. 3d 475, 400 N.E.2d 27.

Another contention of error concerned testimony by two assistant State's Attorneys which, defendants claim, violated the trial court's order, *in limine*, prohibiting evidence of other crimes. The following are examples. During cross-examination by a defense attorney, Assistant State's Attorney Linn was asked if Poree had ever refused to answer any of his questions. Linn responded that "he did refuse to answer one question, but it was *not related to this case.*" No objection was made. Assistant State's Attorney Terrell later testified, also without objection, that he met Lewis at the "Homicide Section"; that he talked about *some unrelated incidents, cases*; that he "told me some things that were *unrelated*" to the robbery; that James "went on to tell me some things about an *unrelated case*"; that another assistant State's Attorney "had a special interest in these defendants"; and finally, that defendants spoke about "a *group* they were in." (Emphasis added.)

■ Generally, evidence which shows that an accused has committed crimes or acts of misconduct which are distinct and entirely unrelated to the crimes charged is both incompetent and prejudicial. (*People v. Curry* (1975), 25 Ill. App. 3d 637, 323 N.E.2d 778.) However, when the evidence of prior criminal acts is not direct, but merely inferential, the issue is the probative and prejudicial effect of the nexus between the admitted and prior criminality. *People v. Banks* (1981), 98 Ill. App. 3d 556, 424 N.E.2d 898; *People v. Allen* (1981), 96 Ill. App. 3d 871, 422 N.E.2d 100.

■ Here, there was no direct evidence of actual prior criminality but at most inferential references to other "unrelated" crimes, the details of which could be supplied only by speculation. Moreover, one reference was invited by questioning propounded by defense counsel, and in not one instance did any of the four participating defense attorneys voice an objection to the complained-of testimony. Accordingly, we find that the comments were not substantially prejudicial as to constitute error requiring reversal. Furthermore, in view of the overwhelming evidence establishing the defendants' guilt, we cannot conclude that the testimony influenced the result of this case, or that the verdict would have been otherwise had the answers now objected to not been made.

Next, James and Lewis contend that the prosecutor made remarks in closing argument which were improper. In closing argument, the prosecutor stated that Lewis joined Powell and James in Memphis. He also referred to defendants as "professionals" and he argued that one-way mirrors are needed for lineups "because of the terror that these guys inspired."

■ Defendants contend that the comment referring to Memphis was not based on the evidence. The record discloses, however, that following this comment Lewis' attorney objected and the trial court promptly admonished the jury to only consider competent evidence and to disregard contrary evidence. Thus, any prejudicial effect resulting from the remarks was sufficiently cured. (See *People v. Jarosiewicz* (1977), 55 Ill. App. 3d 1057, 371 N.E.2d 949.) As to the prosecutor's reference to the defendants as "professionals," similar comments have been upheld as nonprejudicial. (See *People v. Gillarm* (1976), 41 Ill. App. 3d 174, 353 N.E.2d 280.) The rules generally applicable to such comments are that a prosecutor may comment unfavorably on the defendant and the violence of the crime, when supported by the evidence, and speak of the evil results of crime, and even when such comments constitute error, they will not result in reversal if the evidence so clearly indicates the defendant's guilt that the verdict

would not have been otherwise had the comments not been made. *People v. Jackson* (1981), 84 Ill. 2d 350, 418 N.E.2d 739; *Gillarm*.

In the instant case, the evidence portrayed the robbery of the gas station by a group of men who efficiently carried out this planned task with the tools of their trade: masks, a cache of weapons including a semi-automatic carbine, and a stolen getaway car. (See *Gillarm*.) Moreover, even if the references to "professionals" and "terror" were considered to be error, we believe that the evidence established defendants' guilt beyond a reasonable doubt and that the outcome would not have been otherwise had the comments not been made.

Lewis and James next contend that the trial court erred in denying their pretrial motions to suppress their inculpatory statements on the ground that they were the "fruits" of an improper extradition by Tennessee authorities. This issue, however, was not raised by Lewis during his pretrial motion to suppress, or in his post-trial motion for a new trial. Likewise, James failed to raise this issue in his post-trial motion for a new trial. Accordingly, this issue is deemed waived for review. *People v. Edwards* (1978), 74 Ill. 2d 1, 383 N.E.2d 944, *cert. denied* (1979), 442 U.S. 931, 61 L. Ed. 2d 299, 99 S. Ct. 2862.

Finally, Lewis and Sanford contend that the trial court erred in imposing maximum extended-term sentences of 60 years' imprisonment. They claim that the extended-term statute is unconstitutionally vague and, alternatively, that the trial court relied on improper criterion in reaching their sentences. The vagueness argument raised by defendants, however, has been passed on by this court in *People v. Kulpa* (1981), 102 Ill. App. 3d 571, 430 N.E.2d 164, and *People v. Turner* (1981), 93 Ill. App. 3d 61, 416 N.E.2d 1149. These cases have held that section 5—5—3.2(b)(2) of the Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1005—5—3.2(b)(2)) is not unconstitutionally vague and are dispositive of this issue.

Defendants also claim that the trial court erred in concluding that the instant crime constituted exceptionally brutal or heinous behavior indicative of wanton cruelty in imposing the extended terms. The record shows that the trial court, in applying the extended term, expressly relied upon defendants' prior convictions for felonies of the same or greater class within 10 years, and also his belief that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. Sentencing decisions are matters of judicial discretion which must be afforded great weight and deference (*People v. Willingham* (1982), 89 Ill. 2d 352, 432 N.E.2d 861), and so long as the sentence imposed is within the statutory limits, the sentence will

not be set aside absent an abuse of that discretion. See generally *People v. Gallardo* (1983), 112 Ill. App. 3d 764.

■ The instant record supports the trial court's finding with respect to the defendants having prior convictions of the same or greater class as the instant armed robbery. Accordingly, even if the finding with respect to the character of the instant crime is error, extended terms were proper discretionary sentences under the statute. Accordingly, we find no abuse of discretion in the decision to impose the extended terms.

For the foregoing reasons, the judgments of the circuit court are affirmed.

Affirmed.

SULLIVAN and LORENZ, JJ., concur.