THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JACQUELINE GIBONS *et al.*, Defendants-Appellants.

First District (5th Division)   No. 83—2694

Opinion filed October 24, 1986.

38

Steven Clark and Martin Carlson, both of State Appellate Defender's Office, of Chicago, for appellant Jacqueline Gibons.

Peter C. Rolewicz, of Chicago, for appellant Barry Wilson.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Thomas V. Gainer, Jr., and Mary E. Shields, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MURRAY delivered the opinion of the court:

Following a joint jury trial defendants, Jacqueline Gibons, Barry Wilson and Robert St. Pierre, were found guilty of the murders of Benjamin and Sybil Gibons, defendant Gibons' adoptive parents, two counts of conspiracy to commit murder, two counts of armed robbery and two counts of concealment of a homicidal death. (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(a)(1), (a)(2), (a)(3), 8—2(a), 18—2(a), 9—3.1(a).) Gibons and Wilson were sentenced to natural-life imprisonment for the murders, two extended terms of 60 years, to be served consecutively, for the armed robberies of the victims, two concurrent terms of 7 years for conspiracy to commit murder and two concurrent terms of 5 years for concealment of the homicidal deaths of the victims. St. Pierre was sentenced to death; the court entered judgments but no sentences on the other counts. St. Pierre is not a party to this appeal.

On appeal, Gibons contends that: (1) the trial court erred in denying her petition for severance in violation of her rights to a fair trial, to confront witnesses against her, and to present evidence in her defense; (2) the State failed to prove her guilty beyond a reasonable doubt of the armed robbery of Sybil Gibons; (3) the "death qualification" of prospective jurors during *voir dire* resulted in a biased jury favoring the prosecution in violation of her right to an impartial jury representing a fair cross-section of the community; and (4) the court erred in imposing extended terms of 60 years for armed robbery. Wilson contends that: (1) the trial court erred in denying his motion for severance in violation of his right to a fair trial; (2) the court improperly permitted the State to introduce evidence concerning a burglary of the Gibons' residence; (3) the State failed to prove him guilty beyond a reasonable doubt of the armed robberies of both victims; and (4) his sentences were excessive. Both defendants also contend that the court erred in sentencing them for the inchoate offense of conspiracy to commit murder. For the reasons set forth below, we reverse Gibons' and Wilson's convictions and remand their cases for new, and separate, trials.

The record reveals that on July 29, 1982, Benjamin and Sybil Gibons, both approximately 62 years of age, were murdered in their home in Skokie, Illinois. On August 10, 1982, their bodies were found in a remote area of Albuquerque, New Mexico. Both had been beaten to death and the tip of one of Mrs. Gibons' fingers appeared to have

been cut off.

Testimony at trial disclosed that on July 27, 1982, Detective Greg McLaughlin of the Skokie police department was assigned to investigate a burglary of the Gibons' residence. During his conversation with the Gibons, McLaughlin learned that defendant Gibons had told her parents that Wilson telephoned her earlier that day, told her he had fallen through a window of the house and that Gibons should "clean up the mess" before her parents discovered it. When Mr. Gibons later failed to appear before a judge the next day concerning the complaint he had signed, McLaughlin placed a call to the Gibons' residence on July 29, defendant Gibons answered and she told him her father was not at home. McLaughlin called again, on July 31, and received the same response from Gibons.

On August 2, Harriet Metrick, Mrs. Gibons' sister, called the police because she had been told by the senior Gibons' employers that they had not shown up for work. Police officers and Ms. Metrick went to the Gibons' home and entered the house when no one answered the doorbell. Detective McLaughlin arrived shortly thereafter. He found holes cut in the living room carpet and sofa, cleaning fluids and blood-soaked rags and towels scattered about, blood splattered throughout the kitchen, living room and master bedroom, and a large hole broken through the wall between the bedroom closet and the garage. Mr. Gibons' wallet was discovered in the kitchen with a traffic ticket in it describing a 1982 Buick automobile. A belt was found in the bedroom with St. Pierre's name and prison number on it. Further inspection of the garage revealed garbage bags containing bloodstained carpeting, gloves, clothing, and a hammer covered with masonry dust. The automobile was not in the garage, nor were the Gibons on the premises.

McLaughlin further testified he went to the police station to make out a report, then unsuccessfully tried to locate Wilson and Craig Rawlins, a friend of Wilson's. On August 3, McLaughlin met with Gibons; she had been brought to the police station at her own request. At that time, Gibons told McLaughlin how her parents had been killed, implicated Wilson and St. Pierre,[1] told McLaughlin that Wilson was in Los Angeles, California, with Craig Rawlins, and gave him St. Pierre's address.

Gibons further related, in a formal written statement, that six

---

[1] Gibons also implicated Andrea Markson and Sandra Zabrqewski, two girls she had known at the Price Group Home, a girls' "transitional home," where Gibons had lived prior to moving home with her parents. Their cases were severed from Gibons', Wilson's and St. Pierre's.

months prior to the murders Wilson "started hinting" that he was "really thinking of killing her parents" and that he later told her he had bought sleeping pills and a gun with a silencer. During that time, Gibons stated there was never any discussion about her paying Wilson to kill her parents and that she did not think he was serious "until it really happened." On July 28, Wilson called Gibons, she told him her parents were considering pressing charges against him, and he told her he needed some money because her parents were "going down" that evening. The conversation ended when Gibons told Wilson she did not have any money and that she would have to get it the next day. On July 29, Wilson came to Gibons' office, they met with St. Pierre in an alley, and Wilson told her St. Pierre would kill her parents for $300. Although she stated she was in shock and thought that "it was just a game," she agreed to pay St. Pierre. Wilson then told Gibons to open the door of her home later that evening and St. Pierre "would come and do it," and he would "come a little later." At approximately 6 p.m., St. Pierre arrived at the Gibons' home, Gibons and her father admitted him, she went into the living room, and St. Pierre, having picked up a hammer which was lying on a chair in the hallway, followed Mr. Gibons into the kitchen where he killed him by beating him to death with the hammer. Gibons stated that after she heard the "hammering," she opened the front door and Wilson came in. He and St. Pierre wrapped Mr. Gibons' body in a blanket and placed it in the master bedroom. Prior to placing the body in the bedroom, Wilson came into the bedroom and gave Gibons her father's wallet from which she took all of his credit cards.

Thereafter, at approximately 7 p.m., Detective McLaughlin called to speak to Gibons' parents and she told him they were not at home. Mrs. Gibons called 10 minutes later and asked defendant Gibons to pick her up from the train station. Instead of doing so immediately, the defendants drove to a hardware store where Wilson purchased some plastic bags, a roll of tape and sheets of plastic which he said were for tying up Mrs. Gibons' body. When they returned to the Gibons' house, Mrs. Gibons again called to ask defendant Gibons to pick her up. Gibons then left to pick up her mother from the train station. After meeting her, defendant Gibons suggested they go for a drive before going home, her mother declined and Gibons drove home. When Mrs. Gibons entered the house, St. Pierre attacked her with the hammer and beat her to death. Wilson and St. Pierre then wrapped her body in a blanket and plastic and placed it in the bedroom. After they cleaned up the house, Wilson drove Gibons and St. Pierre to a hotel, left them there and drove away. During the drive, St. Pierre stated

that "he did it [the murders] for them" and "they should thank him." Gibons responded that she agreed with him.

The next day defendants returned to the house, Wilson and St. Pierre knocked a hole through the wall of the bedroom to the garage, Gibons helped them push the victims' bodies through the hole, and Wilson and St. Pierre placed them in the trunk of the victims' car. Defendants then drove off in the car. After dropping St. Pierre off at his home, Wilson and Gibons drove around for awhile and discussed "how crazy St. Pierre was" and the fact that Mrs. Gibons' finger had been sliced "because of the ring and who did it." At one point, Wilson stopped at a hotel and showed the bodies to some "black dude." He dropped Gibons off downtown around midnight and told her he was going to take the bodies to Arkansas to be buried by his cousin.

On August 3, Assistant State's Attorney James Lieberman took a statement from St. Pierre. St. Pierre stated that he met Wilson in mid-July 1982. Toward the end of July Wilson told him he had a job for him, that Gibons wanted her parents killed and that St. Pierre would get $1,000 to $10,000 if he killed them. After this conversation, they went to the Gibons' home and Wilson broke in through a window. They were "suppose to get money," but Wilson only came out of the house with some food. On July 29, he met with Wilson and Gibons in an alley. Wilson told Gibons that St. Pierre wanted her to tell him that she wanted her parents killed, and Gibons nodded and said "Yes." They then planned "how they would do it," Wilson and Gibons doing most of the talking and deciding they would use a hammer. After getting $35 from Gibons, Wilson and St. Pierre had lunch and then drank a 12-pack of beer. Later, they went to a bar and had another drink before taking a train out to Skokie. At approximately 5 p.m. they went to a restaurant, Wilson gave St. Pierre the restaurant's telephone number, and St. Pierre left him there and went to the Gibons' home.

St. Pierre further stated that when he arrived at the Gibons' home, defendant Gibons gave him a hammer and asked him to put some gloves on. Refusing to put the gloves on, he followed Mr. Gibons into the kitchen and killed him with the hammer. He then gave Gibons the restaurant's telephone number and she called Wilson who arrived shortly thereafter. After wrapping up Mr. Gibons' body, they cleaned up the kitchen and had a drink. Gibons then left to pick up her mother. Subsequently, while waiting for Mrs. Gibons to arrive, St. Pierre stated that he and Wilson were drinking in the basement, he took a $20 bill from Mr. Gibons' wallet, which he had taken from the victim, and Wilson took the rest. Later, Wilson gave him another $20

bill. St. Pierre also stated that when passing Mrs. Gibons' body through the hole in the closet wall he noticed that someone had cut her finger off apparently for the purpose of removing a diamond ring from her finger which he earlier had unsuccessfully tried to remove after killing her. St. Pierre's further account of the events following the murders until the time Wilson left Illinois were similar to those of his codefendants.

McLaughlin also testified that the police learned that instead of going to Arkansas, Wilson drove to Los Angeles to see Craig Rawlins. When Wilson arrived at Rawlins' home, he called Gibons and asked her to send him some money so he could return to Chicago, which she did. Thereafter, the police traced Wilson and Rawlins to Rawlins' father's home in Phoenix, Arizona. On August 5, McLaughlin and Sergeant Phillip O'Keefe flew to Phoenix to speak with Rawlins who was in police custody. Rawlins told McLaughlin that, while he and Wilson were in Phoenix, Wilson told him that "he and St. Pierre had killed the Gibons—St. Pierre killed the Gibons with a hammer," that defendant Gibons called Wilson to come over after Mr. Gibons was killed, that she later picked up Mrs. Gibons from the train station and St. Pierre killed her after she entered the house, that he helped clean up the house, that he helped knock a hole in the closet wall and push the victims' bodies through it, and that he helped put the bodies in the trunk of the victims' car. Wilson also told Rawlins he had wanted to bring the bodies to Los Angeles to show him, but instead had "dropped" them off near Albuquerque, New Mexico. Wilson further told Rawlins that "Jackie would get the insurance money, but didn't say he [Wilson] would."

McLaughlin also interviewed Wilson who had been taken into custody along with Rawlins. Wilson told McLaughlin he would help them find the victims' bodies and said they were in Missouri. When McLaughlin stated the police knew Wilson had not been in Missouri, Wilson said he could not remember where he had dropped them off because he had been drunk during his drive to Los Angeles. Subsequently, the officers returned to Chicago with Wilson. During the flight, Wilson made an oral statement to Sergeant O'Keefe, telling him he was not present when St. Pierre killed Mr. Gibons, he went to the house after defendant Gibons called him at a restaurant, he saw Mr. Gibons lying on the floor of the kitchen, he helped St. Pierre wrap up the body and carry it to the bedroom, and he helped clean up the kitchen. He further told O'Keefe he was not present when St. Pierre killed Mrs. Gibons, but when told his codefendants stated he was present, he told O'Keefe he was in the hallway when she was

killed. Wilson also stated he helped wrap up Mrs. Gibons' body, knock a hole in the garage wall and put the victims' bodies in the car. After dropping off defendants Gibons and St. Pierre, he drove to California.

Additionally, Wilson stated he and St. Pierre had gone to the Gibons' home looking for defendant Gibons prior to the murders, had fallen through a window and had taken some food from the refrigerator. He denied, however, that he had told Rawlins he left the bodies in New Mexico, stating he did not remember where he left them. On cross-examination, O'Keefe stated that Wilson never said he conspired with his codefendants to kill the Gibons and he never asked Wilson about such a conspiracy. When O'Keefe did ask Wilson why he did not leave the house when he arrived and saw Mr. Gibons' body lying on the kitchen floor, Wilson replied, "I don't know why, I just didn't." He further commented to O'Keefe that St. Pierre was crazy and had just gotten out of jail.

Prior to trial, written motions requesting a severance were filed by each defendant. After examining the motions, the out-of-court written statements of Gibons and St. Pierre and a summary of Wilson's oral statement, as well as hearing arguments by counsel, the trial court denied the motions based on its determination that the statements were substantially the same. At trial, both Gibons and Wilson renewed their motions for severance at various times, but they again were denied. Gibons testified on her own behalf, but neither Wilson nor St. Pierre took the stand. Following trial, the jury found the defendants guilty on all counts, and the State announced that it would seek the death penalty against them. St. Pierre elected to have the jury decide the issue and, following a hearing, it returned a verdict sentencing him to death. Gibons and Wilson waived their right to a jury, and, following a bench hearing, the court found they were both eligible for the death penalty. After hearing further evidence and arguments in aggravation and mitigation, the court sentenced them to natural-life imprisonment for the murders. Gibons and Wilson were sentenced on the remaining counts as previously mentioned above. Their motions for a new trial were denied.

I

■■ We first address Wilson's argument that the trial court's denial of his motion for severance deprived him of a fair trial. Generally, "defendants jointly indicted are to be jointly tried *unless fairness to one of the defendants requires a separate trial to avoid prejudice.*" (Emphasis added.) (*People v. Bean* (1985), 109 Ill. 2d 80, 92, 485 N.E.2d 349; *People v. Daugherty* (1984), 102 Ill. 2d 533, 541, 468

N.E.2d 969, quoting *People v. Lee* (1981), 87 Ill. 2d 182, 187, 429 N.E.2d 461.) A motion for severance is to be filed prior to commencement of trial (Ill. Rev. Stat. 1983, ch. 38, par. 114—8) and must state how the defendant will be prejudiced by a joint trial; mere apprehensions are not enough (*People v. Daugherty* (1984), 102 Ill. 2d 533, 468 N.E.2d 969). In ruling on a severance motion, the court is to make a prediction about the likelihood of prejudice at trial, taking into account "the papers presented, the arguments of counsel, and any other knowledge of the case developed from the proceedings." (102 Ill. 2d 533, 541, 468 N.E.2d 969.) The trial court's decision will not be disturbed absent an abuse of discretion. *People v. Lee* (1981), 87 Ill. 2d 182, 429 N.E.2d 461.

■ Illinois courts recognize two separate grounds for severance. (*People v. Olinger* (1986), 112 Ill. 2d 324, 493 N.E.2d 579.) A defendant may be prejudiced when he is implicated in the hearsay admissions of a codefendant who does not testify, thereby depriving the defendant of his sixth amendment right of confrontation (the *Bruton* rule). (*Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620.) This form of prejudice may be cured by granting a severance or by removing all references to the moving defendant from his codefendants' statements. (*People v. Olinger* (1986), 112 Ill. 2d 324, 493 N.E.2d 579.) An exception to this rule exists where "the defendant himself has confessed and his confession 'interlocks' with and supports the confession of his codefendant." (*Parker v. Randolph* (1979), 442 U.S. 62, 64, 60 L. Ed. 2d 713, 718, 99 S. Ct. 2132, 2135.) In that event, severance is not required, the confessions are admissible and references to the defendant need not be removed; however, the court must give the jury cautionary instructions that it is to consider the statement of each defendant only as evidence against the maker. *Parker v. Randolph* (1979), 442 U.S. 62, 60 L. Ed. 2d 713, 99 S. Ct. 2132; *People v. Davis* (1983), 97 Ill. 2d 1, 452 N.E.2d 525.

A second ground for severance arises when the various defendants' defenses are so antagonistic that one codefendant cannot receive a fair trial when jointly tried. (*People v. Olinger* (1986), 112 Ill. 2d 324, 493 N.E.2d 579; *People v. Bean* (1985), 109 Ill. 2d 80, 485 N.E.2d 349.) Nothing short of severance of the trial of the prejudiced defendant cures this form of prejudice. *People v. Olinger* (1986), 112 Ill. 2d 324, 493 N.E.2d 579.

In the instant case Wilson alleges both forms of prejudice. First, he contends that the trial court erred in its determination that his confession was substantially the same as those of his codefendants, and thus interlocking as the State contends, thereby falling under the

exception to the *Bruton* rule. We agree. Although the rule governing interlocking confessions does not require they be identical (*People v. Sanders* (1982), 103 Ill. App. 3d 700, 431 N.E.2d 1145, *cert. denied* (1982), 459 U.S. 871, 74 L. Ed. 2d 131, 103 S. Ct. 157), they must agree on such crucial facts of time, location, felonious activity, *and awareness of the overall plan or scheme* (*People v. Sanford* (1983), 116 Ill. App. 3d 834, 452 N.E.2d 710).

Briefly, Wilson's oral statement disclosed he was present at the Gibons' home after receiving a telephone call from defendant Gibons and subsequent to Mr. Gibons' murder; he was present when Mrs. Gibons was killed; he helped wrap up the bodies, clean the house, knock a hole in the garage wall and put the victims' bodies into the trunk of the Gibons' car; and he later dropped off his codefendants and left Illinois to dispose of the bodies.

■ Clearly, Wilson's confession was devoid of any admissions, similar to those asserted by his codefendants in their statements, that he participated in a conspiracy to murder the Gibons, that he aided or abetted his codefendants in the murders, that he robbed the victims or that he paid St. Pierre to commit the murders. Therefore, although his statement was similar to his codefendants with respect to the time and location of the crime, it only partially supported the felonious activity and it was crucially dissimilar concerning his alleged awareness of an overall plan or scheme to commit the murders and the subsequent robberies. At this stage, the only evidence that he participated in these acts was contained in Gibons' and St. Pierre's confessions, thus adding critical weight to the State's case against him which the State otherwise could not have obtained from him. (See *Parker v. Randolph* (1979), 442 U.S. 62, 60 L. Ed. 2d 713, 99 S. Ct. 2132.) We further note that although Wilson had the opportunity to cross-examine Gibons, he did not have the same opportunity to confront St. Pierre, who chose not to testify. On this basis, the likelihood of prejudice to Wilson was manifest, and the trial court therefore should either have granted the severance motion or removed all references to Wilson from St. Pierre's statement. Since it did neither, and more weight was likely given to Gibons' testimony as a result of the improper admission of St. Pierre's statement, the court's denial of Wilson's severance motion on this ground of prejudice was reversible error.

We further note that even if the trial court had ordered a redaction of St. Pierre's statement or the State had agreed not to use his statement at trial, denial of Wilson's severance motion would still have been improper in view of the antagonistic nature of Wilson's de-

fense and those of his codefendants. In *People v. Daugherty* (1984), 102 Ill. 2d 533, 543, 468 N.E.2d 969, where each defendant made a statement to the police exculpating himself and inculpating the other, it was held that, although a stipulation by the State not to use either of the defendants' statements at trial would eliminate the source of any problem under the confrontation clause, it would do nothing "to alleviate the codefendants' concerns about their antagonistic lines of defense."

Here, the State argues that no "true conflict" among the defendants' defenses existed and, *arguendo*, that any possible prejudice was cured by the court's cautionary instructions to the jury that the statement of each defendant was to be considered only as evidence against the maker. (See *People v. Davis* (1983), 97 Ill. 2d 1, 452 N.E.2d 525.) We disagree.

Notwithstanding Wilson's stated defense that he would rely on the State's inability to prove him guilty, Wilson contends that his severance motions contained facts, although "admittedly rhetorical," specific enough to show an antagonistic defense to those of his codefendants, *i.e.*, that contrary to his codefendants' assertions, "he did not kill the Gibonses [*sic*], that he did not intend to kill them, and that at most he was guilty of attempting to conceal their bodies." More specifically, he stated in his initial motion for severance that the State would seek to introduce Gibons' and St. Pierre's written statements and that one of the State's theories would be that he was guilty of the murder of both victims "because he is *accountable* for the conduct of Robert St. Pierre and/or Jacqueline Gibons because he, Barry Wilson, solicited Robert St. Pierre to commit this crime and he, Barry Wilson, made arrangements through Jacqueline Gibons to pay money to Robert St. Pierre for killing Benjamin Gibons and Sybil Gibons."

Wilson's motion further alleged that defendant Gibons' confession would indicate that he called her asking for money on July 28 because her parents were to be killed that night; that he discussed plans to kill her parents with Gibons on two prior occasions; that he had procured sleeping pills and a gun to kill her parents; that he said "Bob would kill her parents" for $300; that prior to the murders he was prepared to assist in cleaning up the house and disposing of the bodies; that he was "at her front door immediately after her father was killed, inferring that he, Barry Wilson, was there while her father was being killed *** [which was] *** directly contrary to [his] *** statement to the police"; that he gave her Benjamin Gibons' wallet after St. Pierre killed him which "could be used to prove that a felony murder occurred and therefore, [he,] *** who had the proceeds of the armed

robbery was therefore, guilty of the murder committed in the course of the armed robbery"; that he aided in the commission of the murder of Sybil Gibons; and that he wanted $1,000.

The motion also alleged that St. Pierre's confession would indicate that Wilson proposed the killing of the Gibons for $1,000 to $10,000; that Wilson "took an integral part in planning the method and means of committing the murders"; that Wilson helped with the plans to kill Sybil Gibons; that Wilson paid him $100 for the murders; and that Wilson or Gibons stole a diamond ring from the finger of Sybil Gibons.

Wilson further stated in his supplemental motion for severance that he would "admit to his limited participation in the events that led up to his arrest," but that he would be prejudiced if Gibons testified at trial "because she would testify that he compelled her to commit the acts which caused her to be charged with the murders of the victims, which would compel him to testify that Gibons requested him to provide information and assistance in disposing of her parents"; that Gibons and St. Pierre had made prior plans to kill Gibons' parents; that he never threatened defendant Gibons at any time; and that he would "accuse Gibons of soliciting for the murder of her parents." In Wilson's third severance motion at the close of *voir dire*, but before taking evidence, he alleged that Gibons' counsel clearly indicated that Gibons would testify at trial and that she would state he compelled her to perform the acts which formed the basis of the charges against her.

As our supreme court stated in *People v. Daugherty* (1984), 102 Ill. 2d 533, 544, 468 N.E.2d 969:

> "When codefendants have each made statements implicating the other but professing their own innocence, it is almost inevitable that their lines of defense at trial will become inconsistent and antagonistic and severance is necessary to forestall that result and ensure a fair trial. In such cases, the hostility between the codefendants is likely to surface at trial whether or not they each take the stand themselves. An unacceptable spectacle occurs in which the trial becomes as much a contest between the defendants as it is a contest between either defendant and the prosecution."

In the instant case, we believe Wilson's first severance motion indicated a likelihood of prejudice and set forth with specificity the antagonistic lines of defenses of his codefendants. Based on their statements, Gibons and St. Pierre accused Wilson of conspiring with them to kill the Gibons, aiding and abetting them in the murders and rob-

bing the victims. Both Gibons and St. Pierre also specifically pointed to Wilson as the initiator of the conspiracy and the real perpetrator of the crimes. Conversely, Wilson in effect denied all allegations except for his being present when Mrs. Gibons was killed and in helping to conceal the deaths of the victims. We thus have the classic *Daugherty* situation in which codefendants point a finger at each other as the real perpetrator of the offenses. On the face of his motion, and in conjunction with his codefendants' statements, therefore, the case presented was Wilson's alleged position of extremely limited participation in the crime in opposition to his codefendants' accusations to the contrary. The trial thus became more of a contest between Wilson and his codefendants than the People and the defendants. Wilson therefore was unfairly placed in a position of having to defend against three accusers—the State and his two codefendants.

■■ ▌ Based on Wilson's demonstration of antagonistic defenses, nothing short of his severance from the trial of his codefendants was required. (See *People v. Olinger* (1986), 112 Ill. 2d 324, 493 N.E.2d 579.) The trial court therefore erred in denying his severance motion. Additionally, since the court has a continuing duty at all stages of the proceedings to grant a severance when prejudice appears (*People v. Murphy* (1981), 93 Ill. App. 3d 606, 417 N.E.2d 759), we further find that it was incumbent on the court to grant Wilson a severance at the time of hearing on his third motion when Gibons' counsel stated she would testify and would present her lack-of-intent defense. Thereafter, having failed to do so, the court certainly should have granted a severance after opening statements, when St. Pierre's counsel stated St. Pierre's defense would be that Wilson and Gibons exploited him, getting him drunk so they could manipulate him into committing the murders.

In accordance with the above, we hold that the trial court's denial of Wilson's motions on both grounds for severance resulted in substantial prejudice to him and constituted reversible error. Wilson's convictions are therefore reversed, and the cause remanded for a new, and separate, trial. In light of our disposition on this issue, it is unnecessary to consider Wilson's remaining arguments on appeal.

II

■■ We next address Gibons' argument that the trial court's denial of her severance petition violated her rights to a fair trial, to confront witnesses against her, and to present evidence in her defense. Gibons, like Wilson, alleges both forms of prejudice set forth in part I of this opinion. Initially, she argues that the trial court erred in deny-

ing her petition for severance based on its determination that her confession was substantially the same or interlocking (*Parker v. Randolph* (1979), 442 U.S. 62, 60 L. Ed. 2d 713, 99 S. Ct. 2132) with those of her codefendants and, therefore, fell under the exception to the *Bruton* rule (*Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620). We agree.

Under the circumstances, we believe the situation presented here is analogous to the one in the recent case of *Lee v. Illinois* (1986), 476 U.S. ___, 90 L. Ed. 2d 514, 106 S. Ct. 2056. There, defendant Lee and her codefendant were charged with murdering Lee's aunt and her friend. The defendants were tried jointly in a bench trial at which neither defendant testified. The trial judge specifically relied on Lee's codefendant's confession and rejected her assertions that she had not participated in the murder of her aunt's friend and that she had acted either in self-defense or under intense and sudden passion in killing her aunt. This court, in affirming the trial court, conceded that the trial court considered the codefendant's confession as substantive evidence in finding Lee guilty, but held that her codefendant's confession was reliable[2] and, moreover, interlocked with Lee's and thus did not fall within the rule of *Bruton*. (*People v. Lee* (1984), 129 Ill. App. 3d 1167, 491 N.E.2d 1391 (order under Supreme Court Rule 23).) In reversing this court, the United States Supreme Court stated:

> "If *** portions of the codefendant's purportedly 'interlocking' statement which bear to any significant degree on the defendant's participation in the crime are not thoroughly substantiated by the defendant's own confession, the admission of the statement poses too serious a threat to the accuracy of the verdict to be countenanced by the Sixth Amendment. *In other words, when the discrepancies between the statements are not insignificant, the codefendant's confession may not be admitted.*" (Emphasis added.) (*Lee v. Illinois* (1986), 476 U.S. ___, ___, 90 L. Ed. 2d 514, 529, 106 S. Ct. 2056, 2064-65.)

The court found that Lee had not confessed to a joint plan with her codefendant to murder her aunt, nor did her statement contain any admission of collusion to kill her aunt's friend. The court also empha-

---

[2]Lee's codefendant's confession was categorized as falling under an exception to the hearsay rule, *i.e.*, a declaration against penal interest, which the United States Supreme Court subsequently rejected as a basis for determining the reliability of a confession of a codefendant inculpating another defendant where the defendant's sixth amendment right to confrontation of witnesses against him is at issue. *Lee v. Illinois* (1986), 476 U.S. ___, ___, 90 L. Ed. 2d 514, 528-29, 106 S. Ct. 2056, 2064.

sized that the discrepancies between the two confessions were critical with respect to the couple's premeditation or intent to kill the women. For example, Lee's codefendant stated they "had thought to put on gloves" prior to the killings, whereas Lee stated they put on gloves only to dispose of the bodies. The court stated that these discrepancies went to the very issue in dispute: the roles played in the killing of the friend of Lee's aunt and the question of premeditation in the murder of her aunt.

Here, Gibons does not argue that her statement did not interlock with Wilson's, but instead points to several statements contained in St. Pierre's confession which she contends were crucially dissimilar from her confession. Specifically, she complains that: St. Pierre stated that Wilson told him that "Jackie wanted this [the murders] done" and that in response "Jackie nodded her head and said 'yeah, she wanted it done' "; that St. Pierre stated they all planned how the murders would be done, with Gibons and Wilson doing most of the talking and saying they were going to use a hammer; and St. Pierre's statement that Gibons gave him the hammer used to kill the victims and that she asked him to put some gloves on.

We note that although Gibons stated she met with Wilson and St. Pierre and agreed to pay St. Pierre $300 to murder her parents and she admitted to being told by Wilson of a plan—when to expect Wilson and St. Pierre at her home—she "thought it was only a game." Like the situation in *Lee*, Gibons did not admit that she planned the murders of her parents. In addition, Gibons' and St. Pierre's statements diverge with respect to the factual circumstances relevant to Gibons' premeditation or intent to kill her parents. For example, St. Pierre stated that Gibons helped decide what weapon would be used to kill her parents, that she handed him the hammer used in the murders, and that she told him to put on some gloves, whereas Gibons did not mention any decision concerning the weapon to be used, she testified that St. Pierre picked the hammer up from a chair, and she did not say anything about wearing gloves. Based on these discrepancies, clearly Gibons' case should have been severed from St. Pierre's or the court should have removed all references to Gibons from St. Pierre's statement in light of the fact that Gibons did not have the opportunity to confront St. Pierre. Accordingly, we hold that the trial court erred in denying Gibons' severance motion on this ground of prejudice.

■ We further find that the court initially correctly denied Gibons' severance petition based on the ground of antagonistic defenses. Gibons' petition stated, in pertinent part, as follows:

"That the out-of-court statements of WILSON and ST.

PIERRE not only attempt to mitigate their own involvement in these homicides but also attempt to place maximum responsibility on the Petitioner.

\* \* \*

\*\*\* [I]t is further reasonable to believe that the defenses that will be invoked by both, will be antagonistic to the defense of Petitioner. This antagonism becomes especially critical in view of the fact that his [*sic*] case falls within the purview of the Death Penalty Statute where all parties may feel compelled to mitigate their involvement in an attempt to preclude imposition of the death penalty."

Gibons' petition clearly failed to state with specificity what her codefendants' defenses would be and how she would be prejudiced thereby; her petition is a recitation of mere apprehensions. See *People v. Daugherty* (1984), 102 Ill. 2d 533, 468 N.E.2d 969.

On the other hand, we hold that the court erred in denying her a severance at the time of the hearing on Wilson's third severance motion and after opening statements. At the hearing on Wilson's third motion, as stated in part I of this opinion, it became clear that Gibons' defense would be antagonistic to Wilson's. Even though the court failed to grant a severance at that time, it had the authority to, and should have done so, upon Gibons' request after opening statements, when it also became clear that St. Pierre's defense similarly would be antagonistic to hers. Specifically, St. Pierre's counsel stated that his defense would be that Gibons and Wilson exploited him, getting him drunk so they could manipulate him into committing the murders. This was contrary to Gibons' defense that she lacked the requisite intent to aid or abet her codefendants in the crimes. Nothing short of severance of her trial from her codefendants could have cured such prejudice. (See *People v. Olinger* (1986), 112 Ill. 2d 324, 493 N.E.2d 579.) We find that the trial court therefore erred in denying Gibons a severance at these stages of the proceedings based on the ground of antagonistic defenses.

In light of the above, we hold that the denial of Gibons' motions on both grounds for severance resulted in substantial prejudice to her and constituted reversible error. Gibons' convictions are therefore reversed and the cause remanded for a new, and separate, trial. Because of our disposition on this issue, we do not address Gibons' remaining arguments on appeal.

Finally, we believe that the evidence at trial was sufficient for the trier of fact to conclude that defendants were guilty beyond a reasonable doubt. This does not mean we are making a finding as to defend-

ants' guilt or innocence which would be binding on retrial, but rather our consideration of the sufficiency of the evidence admitted at trial will remove the risk of subjecting defendants to double jeopardy. See *People v. Taylor* (1979), 76 Ill. 2d 289, 391 N.E.2d 366.

For the foregoing reasons, defendants Gibons' and Wilson's convictions are reversed and their causes remanded for new, and separate, trials.

Convictions reversed and causes remanded with directions.

SULLIVAN, P.J., and PINCHAM, J., concur.