89 F.3d 838
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Lorenzo FORD, Petitioner-Appellant,
v.
Odie WASHINGTON, Respondent-Appellee.
 No. 93-3696.
 United States Court of Appeals, Seventh Circuit.
 Submitted June 25, 1996.*
Decided June 25, 1996.
 
 Before CUMMINGS, PELL and FLAUM, Circuit Judges.
 
 ORDER
 
 1
 Lorenzo Ford, an Illinois prisoner convicted of murder, appeals the denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254. He argues that trial counsel rendered ineffective assistance in failing to sever his case from that of his codefendant; failing to quash his arrest and suppress his confession to the police; and failing to object to the prosecution's use of peremptory challenges to remove blacks from the jury. Ford also argues that the district court erred in ruling that he failed to present an issue of constitutional dimension when he claimed that the jury instructions used at his trial failed to set forth the correct burden of proof regarding murder and manslaughter. For the reasons set forth below, we affirm.
 
 BACKGROUND
 
 2
 Lorenzo Ford was convicted of murder for the stabbing death of 18-year-old Roscoe Jenkins. Ford's codefendant, DeWayne Clemons, and another man, known only as Steve, were visiting Krystal Warren, Jenkins's former girlfriend and the mother of his child, on February 24, 1985. Soon after Jenkins arrived to visit his child, Warren, Clemons, and Steve left the apartment and took an elevator down to the lobby. Jenkins, who was in the lobby, pulled Warren out of the elevator by her hair and asked her what she was doing with Clemons and Steve. Jenkins slapped Warren and then punched Steve in the face.
 
 
 3
 Later that night, on their way to a party, Clemons and Warren went into a liquor store where Clemons met his friend, Ford, whom he introduced to Warren. Clemons and Warren continued on to the party, which had already ended by the time they arrived. Clemons and Warren then boarded a bus and discovered that Ford was also on the bus. Clemons told Ford that Roscoe Jenkins had hit Steve in the face earlier that night. Warren testified that Ford had a black-handled knife in his hand with a five-inch blade he kept opening and closing. Clemons gave a statement to police, reporting that Ford said, "I just sharpened this knife and I'm ready to use it, and I hope we bump into the nigger that stole on Steve." (R. 272-73.)
 
 
 4
 Clemons then suggested that they go to his cousin's apartment building, which happened to be the same address where Jenkins was dating another woman. When they arrived at the building, Jenkins pushed the door open, looked at Ford and Clemons, and took a step towards Clemons. Clemons punched Jenkins in the jaw, grabbed his legs, and threw him to the ground. Warren went into the building lobby and then turned around to watch the scuffle. She testified that she saw Clemons holding down Jenkins's arms so that he could not get away and Ford making jabbing motions with his knife. Jenkins finally broke loose and ran away. Ford and Clemons pursued Jenkins but gave up when Jenkins ran into a building further down the street. After Ford and Clemons returned from their chase, Ford wiped the blood off his knife with Jenkins's hat. Warren testified that Ford and Clemons were laughing and that Ford stated he knew what he was doing when he stabbed Jenkins. Jenkins's body was found in the hallway of the building down the street by police at 2 a.m. on February 25, 1985. According to a forensic pathologist who testified at trial, Jenkins died of a stab wound that pierced his lung and heart, and had also sustained small incised wounds on his fingers which she characterized as defensive wounds.
 
 
 5
 In his statement to police, Ford said that when he met Warren and Clemons on the bus, Clemons told him about the altercation at Warren's apartment and that Clemons wanted to look for Jenkins. Ford asked to go along, and the three spent about an hour walking around the neighborhood. According to Ford, Jenkins came out of the apartment building and asked if Clemons was looking for him. Ford said that Clemons hit Jenkins and tried to pull Jenkins to the ground, but Jenkins fell on top of Clemons. Ford stated that he had his knife drawn and he stabbed Jenkins as Jenkins tried to get up. After cleaning the knife with Jenkins's hat, Ford left the knife on a bus.
 
 
 6
 Ford's testimony at trial was different. He testified that he carried a small pocketknife for protection. On the night in question, he said he put the knife inside his glove because Clemons had warned him that the neighborhood was dangerous. He said he did not know Steve and denied that he and Clemons were looking for Jenkins. Ford testified that when they reached the apartment building, the door opened and nearly hit him. He said Jenkins jumped out of the doorway and asked him and Clemons, "[W]hat [are] you punks doing around here?" and grabbed Warren. (R. 407.) Jenkins and Clemons swung at each other and Clemons hit Jenkins. Ford said that Jenkins rushed Clemons and Clemons tried to grab him but fell with Jenkins on top of him. Ford said he became afraid when he saw blood coming down Clemons's head, and pulled out his knife. He admitted he cut Jenkins with the knife because he thought both Clemons and he were going to get hurt. Ford stated that Jenkins kept coming at him so he kept swinging at Jenkins with the knife to keep him away. Ford denied laughing after the incident.
 
 
 7
 The jury convicted Ford of murder on September 18, 1985. The Illinois Appellate Court affirmed Ford's conviction, and the Illinois Supreme Court denied his petition for leave to appeal. Ford then filed both a pro se petition for postconviction relief in the state court that was later supplemented by counsel. That petition was dismissed without an evidentiary hearing. The Illinois Appellate Court again affirmed, and the Illinois Supreme Court denied Ford's petition for leave to appeal that decision.
 
 
 8
 Ford next filed a habeas petition in federal court, 28 U.S.C. § 2254, alleging that:
 
 
 9
 1. trial counsel was ineffective in failing to sever his case from that of codefendant Clemons; failing to quash his arrest and suppress his confession to the police; and failing to object to the State's use of peremptory challenges to remove blacks from the jury; and
 
 
 10
 2. the district court erred in ruling that he failed to present an issue of constitutional significance when he alleged that the Illinois pattern jury instructions used at his trial failed to set forth the correct burden of proof for murder and manslaughter.
 
 
 11
 The district court denied the petition. With regard to Ford's claims of ineffective assistance of counsel, the court held that Ford failed to show that counsel's performance was deficient or that he had been prejudiced by counsel's alleged deficiencies. With regard to Ford's jury instruction claim, the court found that Ford had procedurally defaulted that claim by failing to raise it in his direct appeal. Even if the claim were not procedurally defaulted, the court went on to conclude that jury instructions containing errors of state law may not form the basis for federal habeas relief.
 
 
 12
 Ford raises essentially the same issues on appeal.
 
 DISCUSSION
 
 13
 I. Ineffective Assistance of Trial and Appellate Counsel
 
 
 14
 To prevail on his claims of ineffective assistance of counsel, Ford must show that counsel's performance was constitutionally deficient and that this deficient performance resulted in prejudice to him. Galowski v. Berge, 78 F.3d 1176, 1180 (7th Cir.1996). In determining whether this standard has been satisfied, a habeas court may focus on either prong of this test. Brumley v. Detella, 83 F.3d 856, 861, (7th Cir.1996). We examine the performance prong through a "highly deferential lens, indulging a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Galowski, 78 F.3d at 1180 (citations and internal quotations omitted). In addition, we assign a "strong presumption of reliability" to the original verdict in examining the prejudice prong. Strickland v. Washington, 466 U.S. 668, 696 (1984).
 
 A. Failure to Sever Trials
 
 15
 Ford's strongest claim of ineffective assistance is that trial counsel failed to move to sever his case from that of codefendant Clemons. After being arrested, Clemons had given a statement to police that implicated Ford in the slaying of Roscoe Jenkins. Although Clemons's statement resembled the statement Ford gave to police, Clemons's statement differed in one crucial respect--it suggested that Ford acted with premeditation. Clemons told police that he had talked with Ford about Jenkins's assault on his friend Steve, and that Ford had displayed his knife, stating, "I just sharpened this knife and I'm ready to use it, and I hope we bump into the nigger that stole on Steve." (R. 272-73.) Clemons also described how, later that night outside his cousin's apartment building, he "body slammed" Jenkins to the ground and held him there until Ford came over and stabbed him. (R. 273-74.) These statements were admitted at trial against Clemons, who did not testify. They were also referenced by the State at closing argument against both Ford and Clemons. (R. 506-07, 510-11.)
 
 
 16
 Ford's statement to the police characterized the stabbing as the result of a chance encounter with Jenkins (R. 307). Ford stated that the stabbing occurred when he, Clemons, and Warren were walking around the neighborhood and bumped into Jenkins (R. 358-59). Jenkins said something threatening to Clemons and a scuffle ensued. (R. 307.) According to Ford, Clemons tried to pull Jenkins to the ground but slipped and fell on his back, with Jenkins landing on top of him. At that point, Ford stated, he hit Jenkins with his hand and then cut him with his knife. (R. 359-61.)
 
 
 17
 Ford argues that the use of Clemons's statement in the joint trial devastated his voluntary manslaughter defense and left no doubt in the minds of jurors that he had the necessary premeditation to commit murder. This argument appears to allege a violation of Bruton v. United States, 391 U.S. 123 (1968). There the Supreme Court held that a nonconfessing criminal defendant was deprived of his right under the Sixth Amendment's Confrontation Clause to cross-examine adverse witnesses when his nontestifying codefendant's confession inculpated him and was admitted at their joint trial. A violation of the defendant's rights under the Confrontation Clause is not cured by jury instructions directing the jury to consider the confession only against the confessing codefendant. Id. at 126.
 
 
 18
 We need not decide whether trial counsel rendered deficient performance in failing to sever the trials to avoid a Bruton problem[1] because Ford cannot show that he was prejudiced by the joint trial format. The evidence against Ford at trial was so overwhelming that even if the trial were severed, the jury would still have convicted him of murder.
 
 
 19
 First, Krystal Warren testified as to Ford's role in the stabbing. She testified that she was in the company of Clemons and Ford during the events that led to the slaying. She was aboard the bus when Clemons told Ford that Jenkins had hit a mutual friend in the face, and she saw Ford display a black-handled knife with a five-inch blade, which he kept opening and closing.
 
 
 20
 Warren also testified that she accompanied Ford and Clemons to the apartment building where the slaying occurred. She recalled that when they arrived at the front door of the building, Jenkins pushed open the door and took a step towards Clemons. (R. 168.) Jenkins hands were at his side. Warren testified that she saw Clemons throw the first punch, which hit Jenkins in the jaw. Jenkins stepped back, and Clemons then stooped down and grabbed Jenkins's legs, and body slammed Jenkins to the ground. Warren moved inside the lobby of the building, and from there she continued to watch the three men outside. She saw Ford swinging his knife while Clemons was holding down Jenkins. According to Warren, Ford made stabbing movements with the knife while Clemons prevented Jenkins from escaping. Jenkins managed to break loose and run, with Clemons and Ford in pursuit. When the two men eventually returned, Warren saw Ford and Clemons laughing while Ford wiped blood off of his knife with Jenkins's hat. (R. 176.) According to Warren, Clemons then told Ford, "You could have stabbed me," and Ford replied, "No, I wasn't going to stab you because I was looking [at] what I was doing." (R. 177.)
 
 
 21
 In addition, Ford had given police his own written, signed confession. He admitted cutting Jenkins, although he claimed at trial that he did so only because he thought Jenkins was hurting Clemons. Significantly, however, Ford also admitted that he did not see a weapon in Jenkins's hands. As the Illinois Appellate Court observed, Ford's trial testimony that he was swinging his knife to deter Jenkins is not consistent with the physical evidence presented by the State:
 
 
 22
 Ford admitted that he wielded the knife, but claimed at trial that he did so only because he thought the victim was hurting Clemons. So he, Ford, swung the knife to keep the victim away. Had he intended to merely wave the knife around as a deterrent, however, it is unlikely that he would plunge it into the victim's chest with enough force to pierce the victim's lung and heart. Forensic evidence produced at trial described such a wound as the cause of death. The evidence further showed the presence of small incised wounds on the victim's fingers, which are indicative of defensive wounds. This suggests that Ford swung the knife at least once before inflicting the deeper wound to the heart and lung.
 
 
 23
 People v. Ford, 228 Ill.App. at 217, 592 N.E.2d at 547. Given the overwhelming evidence against him, Ford was not prejudiced by counsel's failure to move for a severance. Had counsel performed as Ford insists they should have, we have no reason to believe the outcome would have been different.
 
 
 24
 B. Failure to Quash Arrest and Suppress Confession
 
 
 25
 Next, Ford argues that he received ineffective assistance of counsel because his trial lawyers failed to move to quash his allegedly illegal arrest and to suppress his statements to the police. This argument is unavailing. As the Illinois Appellate Court found, Ford was arrested without a warrant not in his own home, but rather on the porch where he had come out in response to entreaties made by Clemons. If the state court's finding is accepted as true, then Ford has no constitutional claim because the officer did not need to enter Ford's home to arrest him; he was arrested in a public place. United States v. Sewell, 942 F.2d 1209, 1212 (7th Cir.1991) (defendant who crossed the threshold of his doorway to complete a sale of narcotics deemed to have been in a "public place"), cert. denied, 503 U.S. 962 (1992).
 
 
 26
 Ford's claim that trial counsel failed to move to suppress his statement to the police also fails. As noted by the state appellate court, Ford's confession actually contained some exculpatory information about his mental state. Tactically, moving to suppress a confession containing exculpatory material might be considered counterproductive, especially in light of the expected testimony of eyewitness Krystal Warren. If Ford succeeded in suppressing the confession and then testified at trial, the State could have used the confession to impeach him. If Ford declined to testify, Warren's testimony would have provided overwhelming and unrebutted evidence against Ford. Under these circumstances, defense counsel's decision not to move to quash Ford's arrest or to suppress his confession did not fall below the standard of objective reasonableness.
 
 
 27
 C. Failure to Object to State's Use of Peremptory Challenges
 
 
 28
 Ford also argues that trial counsel rendered ineffective assistance in failing to object to the prosecution's discriminatory use of peremptory challenges at trial. Ford acknowledges that Batson v. Kentucky, 476 U.S. 79 (1986) had not been decided at the time of his trial, but he argues that the theory on which Batson was based existed at the time of jury selection.
 
 
 29
 Initially, we note that Ford failed to allege any facts to support his claim that the State improperly exercised its peremptory challenges. He alleges only that counsel "failed to object to prosecution's use of peremptory challenges to remove Blacks from jury." (R. 1 at 6.) Ford has provided no further allegations showing how he suffered prejudice. Nothing in the record suggests that the removal of all but one black member of the venire produced a jury that was likely to convict an innocent person, or even a jury more likely to convict a guilty person. See United States v. Boyd, --- F.3d ----, No. 94-3352, slip op. at 2 (June 14, 1996).
 
 
 30
 Nor is there any evidence in the record from which we could find counsel's performance to be deficient. Ford was tried in 1985, and his conviction became final in 1987. Batson was decided in April 1986. Trial counsel could not be expected to make a Batson-type argument before Batson was decided, see Ruff v. Armontrout, 77 F.3d 265, 268 (8th Cir.1996), so Ford's counsel cannot be faulted for not objecting to the prosecutor's peremptory challenges during voir dire. In light of the circumstances at the time of trial, trial counsel's failure to raise a Batson-type objection did not fall below the deferential standard of reasonableness set forth in Strickland.[2] Id.
 
 II. Jury Instructions
 
 31
 Finally, Ford argues that the district court erred in finding that he had failed to present an issue of constitutional dimension when he claimed that the Illinois Pattern Jury instructions used in his trial failed to set forth the correct burden of proof regarding murder and voluntary manslaughter. Those instructions were later invalidated by People v. Reddick, 123 Ill.2d 184, 526 N.E.2d 141 (1988). This court subsequently held that the same instructions violated due process under the Fourteenth Amendment. Falconer v. Lane, 905 F.2d 1129 (7th Cir.1990) (holding that former Illinois murder and voluntary manslaughter jury instructions violated due process because "the jury may have been left with the false impression that it could convict the petitioner of murder even if she possessed one of the mitigating states of mind described in the voluntary manslaughter instruction").
 
 
 32
 Ford did not raise the jury instruction issue in his direct appeal, and the district court found that Ford had therefore waived the issue. The district court noted, however, that Ford's state court claims did include a challenge to the trial court's failure to require the jury to return a verdict of voluntary manslaughter--a claim similar to the jury instruction claim raised in the federal petition. The district court went on to conclude that even if Ford's state court claims were construed broadly so as to include the jury instruction claim, Ford still could not prevail. We agree.
 
 
 33
 Ford's argument is foreclosed by Gilmore v. Taylor, 508 U.S. 333, 344-45 (1993). Gilmore held that the Falconer rule constituted a "new" rule that cannot be applied retroactively in proceedings under 28 U.S.C. § 2254. Because Ford's direct appeal ended in 1987, well before this court's decision in Falconer, Ford's jury instruction claim lacks merit.
 
 III. Other Claims
 
 34
 Ford's remaining claims can be disposed of in short order. Ford argues that the district court erred in ruling on his petition without considering his claims that (1) the state trial court improperly admitted other crimes evidence regarding a "prior stabbing" and (2) the state improperly made reference to his membership in a Chicago street gang. (Ford's Br. at 7.) Ford failed to raise these claims in his federal habeas petition, however, and they are therefore waived.
 
 AFFIRMED.[3]
 
 
 *
 After preliminary examination of the briefs, the court notified the parties that it had tentatively concluded that oral argument would not be helpful to the court in this case. The notice provided that any party might file a "Statement as to Need of Oral Argument." See Fed.R.App.P. 34(a); Cir.R. 34(f). No such statement having been filed, the appeal is submitted on the briefs and the record
 
 
 [1]
 It is not clear that Bruton even applies to these facts. This court has held that where a codefendant's statement is merely additional evidence of a fact already testified to, that statement does not violate Bruton. See United States v. Cirrincione, 780 F.2d 620, 633 (7th Cir.1985). Here, Clemons's statement was substantially similar to the testimony presented by Krystal Warren. Warren testified that on the night she and Clemons found Ford on the bus, she saw Ford opening and closing the blade of a black-handled knife. She also testified that, later that night, at the scene of the stabbing, she saw Ford make jabbing movements with the knife while Clemons held Jenkins down
 Furthermore, at the time of the trial, Illinois and the federal courts generally permitted the introduction of "interlocking" confessions in a joint trial. Hanrahan v. Greer, 896 F.2d 241, 243 (7th Cir.1990) (citing Parker v. Randolph, 442 U.S. 62 (1979)). According to that doctrine, when the defendant's own inculpatory confession overlaps with that of a codefendant, the possible prejudice resulting from the jury's failure to follow limiting instructions does not require exclusion of testimony. See Parker, 442 U.S. at 74-75. Ford's confession in large part parallels Clemons's; Ford, for instance, admitted to police that he was swinging his knife at Jenkins and did in fact cut him. Although the Supreme Court repudiated the use of interlocking confessions in Cruz v. New York, 481 U.S. 186 (1987), that case was handed down two years after Ford's 1985 conviction. Because the law as it stood in 1985 permitted the use of interlocking confessions, see People v. Gibbons, 149 Ill.App.3d 37, 50, 500 N.E.2d 517, 525 (Ill.App.Ct.1986), Ford's trial counsel could not be expected to forecast the Supreme Court's future decision in Cruz. The case law is clear that an attorney's failure to anticipate changes in existing law does not rise to the level of constitutional ineffectiveness. Lilly v. Gilmore, 988 F.2d 783, 786 (7th Cir.), cert. denied, 114 S.Ct. 154 (1993); Kornahrens v. Evatt, 66 F.3d 1350, 1360 (4th Cir.1995) (citing cases), cert. denied, 116 S.Ct. 1575 (1996); Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir.1994).
 
 
 [2]
 It is a closer question whether appellate counsel rendered deficient performance in failing to raise the Batson claim in Ford's direct appeal, but that claim is problematic as well. See Nickerson v. Lee, 971 F.2d 1125, 1135-36 (4th Cir.1992) (no deficient performance where counsel failed to raise Batson claim on direct appeal, even though conviction did not become final until seventeen months after Batson was decided), cert. denied, 507 U.S. 923 (1993); Randolph v. Delo, 952 F.2d 243, 246-47 (8th Cir.1991) (per curiam) (no deficient performance where counsel failed to raise Batson claim on direct appeal, which was decided eleven months after Batson was decided), cert. denied, 504 U.S. 920 (1992)
 
 
 [3]
 On April 24, 1996, while this case was pending on appeal, the President signed into law the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104-32, 110 Stat. 1214. Title I of this Act significantly curtails the scope of federal collateral review of state convictions and sentences. We need not decide in this case to what extent the amendments in the Act apply to petitions pending when the Act was signed into law, or what effect those amendments have if they apply, because, even under the more expansive scope of review permitted prior to the Act, the petitioner in this case is not entitled to relief